IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA D. BRYAN,                          *

     Plaintiff,                        *

v.                                      *

                                 Civil Action No. 1:03-cv-00265-AMD

LUCENT TECHNOLOGIES INC.,               *

     Defendant.                        *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Lucent Technologies Inc. ("Lucent"), through undersigned counsel, respectfully submits this Memorandum of Points and Authorities, with attached exhibits, in support of its Motion for Summary Judgment. Plaintiff is unable to put forward sufficient evidence to support her claims of sexual harassment, retaliation or gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"). Lucent's Motion for Summary Judgment should therefore be granted and Plaintiff's Complaint should be summarily dismissed.

## I.    STATEMENT OF FACTS

Lucent is engaged in the design, manufacture and sale of telecommunications equipment, and maintains an office in Linthicum, Maryland. (See *Complaint and Answer at ¶¶ 4*). Plaintiff, who was originally hired as a telephone operator by a Lucent predecessor in 1978, transferred to Linthicum in October of 1998. (*Plaintiff's Deposition, attached hereto as Exhibit A, at 14 line 18 – 15 line 3, 19 lines 5-8, 20 lines 3-6 and 24 lines 2-9*). After a short time, Plaintiff was made an account manger on Lucent's Verizon team, responsible for addressing year 2000 software concerns. (*Plaintiff's Depo. (Ex. A) at 20 lines 12-15, 31 lines 6-14 and 36 lines 13-19*).

In late 1998, Mr. Christopher Herr was promoted within Lucent and transferred from Connecticut to the Linthicum, Maryland location. (*Deposition of Christopher Herr, attached hereto as Exhibit B, at 29 line 17 – 30 line 9*). Mr. Herr was made a Director of Sales Realization on the Verizon team, and became Plaintiff's supervisor in December of 1998. (*Plaintiff's Depo. (Ex. A) at 34 lines 7-15*). From December of 1998 to July of 1999, Plaintiff alleges that she was harassed by Mr. Herr. Mr. Herr denies most, but not all, of Plaintiff's allegations. Ignoring these denials solely for purposes of summary judgment, however, the relevant allegations before the Court are as follows:

1.  In December of 1998, Plaintiff alleges that Mr. Herr told her that he was exhausted from a trip with his wife in which she "had [him] in bed all week-end." (*Plaintiff Depo. (Ex. A) at 94 line 4 - 95 line 13*).

2.  In January of 1999, Plaintiff alleges that Mr. Herr commented to Plaintiff that he had a customer who would take trips to a nudist camp, and that this customer gave him a blowup doll as a going-away present. (*Plaintiff Depo. (Ex. A) at 100 lines 10-21*).

3.  In January of 1999, Plaintiff alleges that Mr. Herr held a team lunch with two male employees, but did not invite Plaintiff or another female co-worker. (*Plaintiff Depo. (Ex. A) at 103 line 19 – 105 line 10*).

4.  In April of 1999, Plaintiff alleges Mr. Herr jokingly told her that he had awakened his wife when he dreamed of Plaintiff lying beside him and called out her name. (*Plaintiff Depo. (Ex. A) at 107 lines 1-15*).

5.  On April 13, 1999, Plaintiff alleges that Mr. Herr traveled to a hotel in New Jersey with Plaintiff and a female co-worker. When he discovered that he did not have a room reserved, he asked with whom he would be sharing a room. (*Plaintiff Depo. (Ex. A) at 109 lines 1–21*).

6.  In May of 1999, Plaintiff alleges that Mr. Herr displayed his underwear to her while packing. (*Plaintiff Depo. (Ex. A) at 112 lines 11-21*).

7.  From October of 1998 to July 1999, Mr. Herr allegedly referred to Ms. Bryan as "big girl" and to another female co-worker as "little girl." (*Plaintiff Depo. (Ex. A) at 116 lines 5-9*).

8.     From November of 1998 until July of 1999, Mr. Herr, in response to update reports presented by Plaintiff, allegedly said on three to five occasions: "tell me more, I'm getting a woody." (*Plaintiff Depo. (Ex. A) at 120 lines 5-21*).

9.     On five or six occasions, Plaintiff alleges that Mr. Herr stated that a female supervisor made his "sphincter twitch," and then clenched and opened his fist. (*Plaintiff Depo. (Ex. A) at 127 line 16 – 128 line 11*).

10.    Plaintiff alleges that Mr. Herr once commented that a phone conference was so long that he needed to relieve himself in a bottle, and that on occasion when Plaintiff was on the phone, Mr. Herr would walk by and wave an empty bottle. (*Plaintiff Depo. (Ex. A) at 130 lines 1-12 and 135 line 7 – 136 line 2*).

11.    During his supervision of her, Plaintiff alleges that on several occasions Mr. Herr would refer to female managers as having their "panties in a ruffle." (*Plaintiff Depo. (Ex. A) at 136 lines 16-20 and 137 lines 18-20*).

By July of 1999, Plaintiff approached Mr. Herr and asked to be removed from his team. (*Plaintiff Depo. (Ex. A) at 138 line 12 – 139 line 11*). The next day, Plaintiff was contacted by Ms. Sarah Brazier, Mr. Herr's supervisor, and by Mr. Ed May, Human Resources Director, who asked why she wanted to be transferred. (*Plaintiff Depo. (Ex. A) at 141 lines 16–20 and 143 lines 10-16*). Plaintiff then met with Ms. Brazier and Mr. May to express her concerns about Mr. Herr. (*Plaintiff Depo. (Ex. A) at 138 lines 2–10* ). Following her complaints, Mr. May reprimanded Mr. Herr, told him unequivocally that his behavior was unacceptable, and informed him that if such behavior did not stop immediately, he would be terminated. (*Herr Depo. (Ex. B) at 141 line 11 – 142 line 10*). In addition, Mr. May ordered Mr. Herr to undergo appropriate management training, and Mr. Herr attended three full days of coaching and diversity training, including training on sexual harassment. (*Herr Depo. (Ex. B) at 14 line 9 – 22 line 10 and 144 line 7 – 145 line 5; Plaintiff Depo. (Ex. A) at 154 line 19 – 155 line 1*).

In late July of 1999, Plaintiff was removed from Mr. Herr's supervision at her request. (*Plaintiff Depo. (Ex. A) at 40 lines 9-15 and 156 line 20 – 158 line 10; Herr Depo. (Ex. B) at 148 lines 3-14*). From July through early October, Plaintiff was then transitioned into her new

3

position as Supplier Diversity Account Manager, responsible for facilitating the use of minority and female-owned businesses as vendors on the Verizon account. (*Plaintiff Depo. (Ex. A) at 40 lines 16-20 and 54 line 6 – 55 line 5*). Plaintiff was supervised in this new position by Mr. Dick McFaul until early summer of 2000, when her supervision switched to Mr. John Donaldson. (*Plaintiff Depo. (Ex. A) at 46 line 20 – 47 line 21 and 49 lines 3-10*).

In June of 2000, Mr. Tom Moore was promoted to the position of Vice President of Sales Realization on the Verizon team. Mr. Donaldson reported to Mr. Moore, and Ms. Bryan was thus for the first time within Mr. Moore's line of supervision. (*Plaintiff Depo. (Ex. A) at 52 lines 5-16; Deposition of Tom Moore, attached hereto as Exhibit C, at 5 lines 11-16*). In November, Ms. Pam Worley was promoted into Mr. Donaldson's position and began to supervise Plaintiff directly. (*Plaintiff Depo. (Ex. A) at 51 lines 6-9*).

By early 2001, Lucent began to experience a severe economic downturn, and downsized its workforce throughout the year. (*Plaintiff Depo. (Ex. A) at 76 lines 3-5; Affidavit of Tom Moore, attached hereto as Exhibit D, at ¶ 3*). A downsizing occurred on the Verizon team in February 2001, and a second downsizing then occurred in March. (*Plaintiff Depo. (Ex. A) at 76 lines 6-14; Moore Affidavit (Ex. D) at ¶ 3*). Plaintiff, however, was not a target of either of these downsizing efforts, and in fact was never once in jeopardy of losing her job during 2001. (*Plaintiff Depo. (Ex. A) at 229 lines 3-15; Moore Affidavit (Ex. D) at ¶ 4*).

Although her job was never at risk, Plaintiff began to have difficulties with her new supervisor, Ms. Worley, and ultimately with Mr. Moore as well. Plaintiff complained that Ms. Worley failed to notify her about a presentation, did not return her emails or calls, and generally made her feel excluded from the team. (*Plaintiff Depo. (Ex. A) at 250 line 16 - 251 line 17*). Plaintiff was also disturbed that Ms. Worley, at Mr. Moore's instructions, was "re-evaluating"

Plaintiff's performance. (*Plaintiff Depo. (Ex. A) at 235 line 14 - 236 line 12*). In fact, Mr. Moore had simply instructed Ms. Worley that, as a new manager on the team, she needed to "find out what your people are doing." (*Moore Depo. (Ex. C) at 102 lines 7-14*). Plaintiff, however, evidently believed that such scrutiny was unfair.

Difficulties also arose with Plaintiff's management of the Supplier Diversity Program. When Plaintiff took over the program in 1999, Verizon was requesting that approximately 15% of Lucent vendors be minority or female-owned businesses. Lucent's vendor usage, however, was only at 5% diversity. (*Plaintiff Depo. (Ex. A) at 55 line 6-56 line 2*). By early 2001, Plaintiff had increased supplier diversity to almost 25%. (*Plaintiff Depo. (Ex. A) at 57 line 14-58 line 10*). As Lucent paid a premium for use of such minority suppliers, however, Plaintiff's overshooting of Verizon's 15% request actually resulted in a loss of potential profits for Lucent. (*Plaintiff Depo. (Ex. A) at 66 line 4 - 67 line 10; Moore Depo. (Ex. C) at 128 lines 2-8*).

On February 10, 2001, Plaintiff met with Ms. Worley to discuss her performance as Supplier Diversity Account Manager, and alleges that Ms. Worley referred to the Supplier Diversity program as a "run-away train." (*Plaintiff Depo. (Ex. A) at 286 line 17 - 287 line 1*). On February 13, Plaintiff then met with Mr. Moore, who allegedly told her that she was not properly managing the Supplier Diversity Program and that she was to be removed from her Compensation Plan, so that she would now receive only a base salary rather than salary plus commission. (*Plaintiff Depo. (Ex. A) at 286 line 3 - 287 line 15*).[1] Plaintiff contends that Mr. Moore also told her that he was glad she was now being supervised by a woman, as some of her

---

[1] Mr. Moore denies ever threatening to remove Plaintiff from the Compensation Plan. In fact, Mr. Moore himself did not even have the authority to take such action, and needed the approval of both Human Resources and the President of North America Sales to effectuate such a change. (*Moore Affidavit (Ex. D) at ¶ 5*). Even if it is assumed that Mr. Moore did threaten to remove Plaintiff from the Compensation Plan, however, it is undeniable that Plaintiff was never actually removed from compensation. (*Id.*).

previous managers may have evaluated her based on her looks and not her performance. (*Plaintiff Depo. (Ex. A) at 270 lines 4-20, 272 line 19 - 273 line 11 and 276 lines 2-17).*[2]

Following her meeting with Mr. Moore, Plaintiff began contacting numerous people within Lucent about transferring to another team. (*Plaintiff Depo. (Ex. A) at 301 lines 4-20*). With Lucent in the midst of downsizing, however, positions were scarce, and the only opening was that of Marketing Manager on the Government team, reporting to Patrick Loprete. (*Plaintiff Depo. (Ex. A) at 68 lines 6-10, 302 line 15 - 303 line 9 and 304 lines 6-14*). Although the Marketing Manager position would not allow Plaintiff to receive commissions, Plaintiff discussed with Mr. Loprete the potential to move into sales with commission compensation down the road. (*Plaintiff Depo. (Ex. A) at 305 line 14 - 306 line 3*). Plaintiff therefore accepted a position on the Government team, and ultimately transferred off the Verizon team, and out of Mr. Moore's supervision, on April 1, 2001. (*Plaintiff Depo. (Ex. A) at 53 line 6 - 54 line 1*).

Plaintiff contends that in late February she informed Mr. Moore that she had interviewed with the Government team, and that Mr. Moore said that the Government team was a bunch of "losers." (*Plaintiff Depo. (Ex. A) at 320 line 15 - 321 line 11*). Plaintiff was a highly-ranked employee on the Verizon team at this time, and Mr. Moore tried to talk her out of leaving the team. (*Plaintiff Depo. (Ex. A) at 423 line 19 - 424 line 5*). During the discussion, when Plaintiff brought up issues involving Mr. Herr, Plaintiff alleges that Mr. Moore stated that he had "absolved" Mr. Herr and that "boys will be boys." (*Plaintiff Depo. (Ex. A) at 322 line 18 - 323

---

[2] Mr. Moore denies ever making such a comment. (*Moore Depo. (Ex. C) at 107 line 17-21*). More importantly, Plaintiff conceded during her deposition that Mr. Moore's alleged comment indicated that he did not believe that evaluating someone based upon their looks rather than their performance was proper. (*Plaintiff Depo. (Ex. A) at 276 lines 2-17*).

*line 14).*[3]  Plaintiff also alleges that, during this discussion, Mr. Moore asked her: "How does it feel to have your career ruined for no reason?" (*Plaintiff Depo. (Ex. A) at 423 lines 2-10*).[4]

Because Plaintiff, in accepting a transfer to the Government team, would be moving from a commissioned position to a non-commissioned position, Plaintiff requested a transition plan from her supervisor on the Government team, Patrick Loprete. (*Plaintiff Depo. (Ex. A) at 309 lines 6-14*).  Mr. Loprete worked with Mr. Moore on such a transition plan. (*Moore Affidavit (Ex. D) at ¶ 6; Deposition of Patrick Loprete, attached hereto as Ex. E, at 30 line 10 - 31 line 2*). In fact, neither Plaintiff's transfer to the Government team nor her transition compensation plan could have been effectuated without Mr. Moore's approval, and Plaintiff herself was forced to concede that Mr. Moore expended a great deal of effort to ensure that she received a fair transition plan. (*Plaintiff Depo. (Ex. A) at 308 line 28 - 309 line 5, 319 lines 5-10 and Depo. Ex. 7; Moore Affidavit (Ex. D) at ¶ 6*).  This transition compensation plan would have made up most, if not all, of Plaintiff's lost commission in transferring from the Verizon team to the Government team for at least one year, and possibly longer. (*Loprete Depo. (Ex. E) at 31 lines 11-19*).

At the time of her transition to Lucent's Government team, Plaintiff was also discussing an employment offer with Signal Corporation, a minority-owned federal contractor. (*Plaintiff Depo. (Ex. A) at 341 lines 2-16*).  On April 6, Signal offered Plaintiff the position of Vice President for Commercial Markets and the opportunity to head-up an entirely new division at Signal. (*Plaintiff Depo. (Ex. A) at 342 lines 4-11 and 343 line 10 - 344 line 6*).  Signal offered to pay Plaintiff $240,000 per year in salary and bonus, tens of thousands of dollars in excess of

---

[3] Mr. Moore denies ever using the phrase "boys will be boys." (*Moore Depo. (Ex. C) at 90 line 21 - 91 line 7*).

[4] Mr. Moore also strenuously denies ever making this alleged statement. (*Moore Affidavit (Ex. D) at ¶ 6*).

what Plaintiff estimated she would have made in 2001 if she had stayed at Lucent. (*Plaintiff Depo. (Ex. A) at 72 line 17 - 73 lines 14 and 348 lines 8-16*).

On April 14, Plaintiff had a discussion with Mr. Moore about the Supplier Diversity Program. (*Plaintiff Depo. (Ex. A) at 330 lines 8-15*). During this discussion, Plaintiff alleges that Mr. Moore said: "I can get you back in my team at any time, you're not safe." (*Plaintiff Depo. (Ex. A) at 332 line 8 - 333 line 6*). Mr. Moore denies having ever made such a statement, and in fact, did not have the authority himself to transfer Plaintiff back to the Verizon team. (*Moore Affidavit (Ex. D) at ¶ 7*). Regardless, Plaintiff tendered her resignation from Lucent effective May 11, 2001, and her last day at Lucent on the Government team was May 23rd. (*Plaintiff Depo. (Ex. A) at 340 lines 9-17 and 530 lines 19-21*).

Plaintiff commenced work for Signal Corporation on June 1, but things did not progress well. (*Plaintiff Depo. (Ex. A) at 358 line 19 - 359 line 8*). On November 28, Plaintiff wrote to Mr. Rob Smith, Chief Administrator Officer at Signal, stating:

> I made not only a career decision but a life decision to leave Lucent Technologies after being employed for over 23 years. I would never have made a decision to leave for a short-term position.

(*Plaintiff Depo. (Ex. A) at 341 lines 17-19, 367 lines 2-8 and Depo. Ex. 10*). Plaintiff was terminated by Signal on November 30, 2001, and subsequently brought suit against Signal in the Circuit Court for Montgomery County. (*Plaintiff Depo. (Ex. A) at 369 lines 3-6 and 375 line 21 - 376 line 4*). Interestingly, Plaintiff alleges in her suit against Signal that Signal fraudulently induced her to leave Lucent with promises of one-year window to develop business for Signal. (*Plaintiff Depo. (Ex. A) at 377 line 18 - 378 line 3, 378 line 16 - 379 line 5, 380 line 13 - 381 line 1 and Depo. Ex. 12*).

## II.    STANDARDS ON SUMMARY JUDGMENT

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P.56. To defeat a motion for summary judgment, Plaintiff must produce more than a mere scintilla of evidence: "[i]f the evidence is merely colorable, or not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).    Plaintiff's unsupported speculation, conclusory statements and self serving assertions are not sufficient to defeat a motion for summary judgment. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996); Felty v. Graves-Humpheys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial and entitles the moving party to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an important part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." See Mackey v. Shalala, 43 F.Supp.2d 559, 564 (D. Md. 1999) (quoting Celotex, 477 U.S. at 327). See also Boarman v. Sullivan, 769 F. Supp. 904, 906 (D. Md. 1991). As various courts have noted, a defendant "should not be required to undergo the considerable expense of preparing for and participating in a trial unless the plaintiff has produced evidence on which a jury might rely in support of the claims alleged." Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530, 532 (D. Md. 1998) (quoting E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F.Supp 567, 573 (D. Md. 1988)).

When considered in light of these standards, Plaintiff's claims clearly fail to establish the existence of any genuine issue of material fact for submission to a jury. Lucent should therefore be granted summary judgment as a matter of law.

### III.    PLAINTIFF'S CLAIM OF SEXUAL HARASSMENT IS TIME BARRED

Under Title VII, an incident that occurred over 300 days prior to a charge being filed with the EEOC is time-barred. See 42 U.S.C. § 2000e-5(e)(1). See also Jackson v. Maryland, 171 F. Supp. 2d 532, 541 (D. Md. 2001); McCain v. Waste Management, Inc., 115 F. Supp. 2d 568 (D. Md. 2000). Plaintiff may attempt to bring in conduct that occurred more than 300 days before her Charge was filed under the continuing violation theory. Last year, however, the Supreme Court both defined and significantly limited the continuing violation theory. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002). It held that discrete acts, such as a failure to promote, each constitute a separate unlawful employment practice, and that all such discrete acts that occurred prior to 300 days from the charge being filed are time-barred. See id., 122 S. Ct. at 2073. Conduct alleged to constitute part of the same actionable hostile work environment claim that falls outside of the limitations period can be actionable only if an act contributing to the claim occurs within the limitations period. Id., 122 S. Ct. at 2074.

Plaintiff failed to file a Charge of Discrimination with the EEOC until December 14, 2001, shortly after she was terminated by Signal. (Complaint and Answer at ¶¶ 4; Plaintiff Depo. (Ex. A) at 172 lines 15-17). As a result, even considering the potential application of the continuing violation theory, Plaintiff must be able to point to some conduct which rises to the level of, or is at least in the nature of, sexual harassment which occurred after February 17, 2001 (300 days prior to her EEOC filing) to overcome Lucent's statute of limitations defense. By her own admission, however, Plaintiff is unable to meet this burden.

As Plaintiff has explicitly conceded, her sexual harassment claim is based solely and exclusively upon the comments and conduct of Mr. Herr. (*Plaintiff Depo (Ex. A) at 167 lines 16-18 and 170 lines 8-16*). During her deposition, Plaintiff testified at length concerning this alleged harassment by Mr. Herr. Every incident involving Mr. Herr, however, dates back to 1998 and 1999. See Statement of Facts, supra. Thus, by her own testimony, Plaintiff is unable to point to a single incident which occurred after February 17, 2001, or within 300 days of her EEOC filing. Plaintiff's claims for sexual harassment and hostile work environment are therefore time-barred and should be summarily dismissed.

### IV.    LUCENT SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION AND RETALIATION

Plaintiff next claims that she was retaliated against by Lucent because of her complaints about Mr. Herr and discriminated against on the basis of her gender. As with her claim for sexual harassment, Plaintiff must establish that some retaliatory or discriminatory conduct occurred after February 17, 2001 (300 days prior to her EEOC filing) to overcome Lucent's limitations defense. See Morgan, 122 S. Ct. at 2073 (holding that discrete acts each constitute separate unlawful employment practices, and that all discrete acts that occurred prior to 300 days from the filing of a charge are time-barred). A review of the facts, however, reveals only two alleged adverse actions by Lucent which even arguably occurred with the limitations period: first, the purported threat by Mr. Moore to remove Plaintiff from Lucent's compensation program; and second, Plaintiff's assertion that she was constructively discharged. Neither of these actions is sufficient to give rise to a cognizable Title VII cause of action, however, and Plaintiff's claims for retaliation and gender discrimination are therefore subject to summary judgment.

11

A.    **Plaintiff's Retaliation and Gender Discrimination Claims Should be Analyzed under the _McDonnell-Douglas_ Standard**

Plaintiff may assert that the alleged comments of Mr. Moore to Plaintiff that "boys will be boys" and "[h]ow does it feel to have someone ruin your career for no reason?" somehow constitute direct evidence. These isolated comments, however, fall far short of the demanding direct evidence threshold. Direct evidence is evidence which, if believed, would prove the existence of the fact without any inferences or presumptions. See Malina v. Baltimore Gas and Electric Co., 18 F. Supp. 2d 596, 605 n. 6 (D. Md. 1998) (citing O'Conner v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548 (4th Cir. 1995)). A statement that requires an inference is not direct evidence. See Mungro v. Giant Food, Inc. 187 F. Supp. 2d 518, 521 (D. Md. 2002). As the alleged statements of Mr. Moore clearly require the Court to draw numerous inferences, the statements are not direct evidence.

Instead, Plaintiff's claims of retaliation and gender discrimination are best analyzed under the familiar burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Nichols v. Harford County Board of Education, 189 F. Supp. 2d 325, 340-1 and 343-4 (D. Md. 2002); Chika v. Planning Research Corp., 179 F.Supp.2d 575, 580-1 (D. Md. 2002). Under this scheme, Plaintiff must first establish by a preponderance of the evidence a prima facie case of retaliation and/or discrimination. "This initial showing requires the plaintiff to produce 'a set of facts which would enable the fact-finder to conclude with reasonable probability that in the absence of any further explanation, the adverse employment action was the product of [retaliation and/or gender] discrimination.'" Nichols v. Harford County, 189 F. Supp. 2d at 340 (D. Md. 2002) (citing Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993)).

12

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show legitimate, non-retaliatory and/or non-discriminatory reasons for its actions. The defendant's burden is one of production, not persuasion. See Chika, 179 F.Supp.2d at 581; Nichols v. Harford County, 189 F. Supp. 2d at 340-1. If the defendant produces this evidence, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were a mere pretext for intentional and prohibited retaliation and/or discrimination. See Langerman v. Thompson, 155 F.Supp.2d 490, 496 (D.Md. 2001); Chika, 179 F.Supp.2d at 581.

In the present matter, Plaintiff is unable to establish a prima facie case of either retaliation or gender discrimination, and likewise cannot prove that Lucent's legitimate, non-retaliatory and non-discriminatory reasons for its actions were a mere pretext for intentional retaliation or discrimination. As a result, summary judgment should be entered in favor of Lucent and against Plaintiff on her claims of retaliation and gender discrimination.

### B.    Plaintiff's Claims for Retaliation and Gender Discrimination Fail as a Matter of Law

#### 1.    Plaintiff is Unable to Establish a Prima Facie Case of Retaliation

The essential elements of a prima facie case of retaliation are well known:

    (1) The plaintiff engaged in a protected activity;

    (2) The employer took an adverse action against the plaintiff; and

    (3) A causal connection exists between the protected activity and
        the adverse action.

See, e.g., Nichols, 189 F. Supp. 2d at 343; Church, 180 F. Supp. 2d at 744. See also Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 754 (4th Cir. 1996). A review of the facts in this matter clearly establishes that Plaintiff is unable to establish either that she suffered a legally

cognizable adverse action, or that any causal connection exists between any protected activity and any purported adverse action. Plaintiff's retaliation claim is therefore subject to summary judgment at the prima facie level.

a.    **Plaintiff Cannot Establish the Existence of a Legally Cognizable Adverse Action or a Constructive Discharge[5]**

It is well settled that Title VII's protections extend only to adverse employment actions. See Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) ("employment discrimination laws require as an absolute precondition to suit that some adverse employment action has occurred"). As the Courts have noted, "[e]mployer conduct amounts to an adverse employment action if it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Nichols v. Comcast Cablevision of Maryland, 84 F. Supp. 2d 642, 654 (D. Md. 2000) (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). In attempting to point to an actionable adverse employment action, Plaintiff's case quite simply fails.

Plaintiff contends that the two individuals who retaliated against her for her complaints against Mr. Herr were Mr. Moore and Ms. Worley. (*Plaintiff Depo (Ex. A) at 385 lines 18-19 and 391 lines 3-7*). She maintains that Mr. Moore retaliated against her by threatening to take her off compensation; by "bad-mouthing her;" by offering her potential opportunities but not following through; and by otherwise being "hurtful." (*Plaintiff Depo (Ex. A) at 386 line 9 – 387 line 14*). She maintains that Ms. Worley retaliated against her by "screaming" at her on several occasions; by calling the Supplier Diversity Program a "run-away train;" and by failing to

---

[5] These arguments apply to Plaintiff's claim of gender discrimination as well as to her claim of retaliation.

include Plaintiff in meetings or to make her aware of a presentation she was to give. (*Plaintiff Depo (Ex. A) at 388 line 11 – 389 line 15*).

Of all of Plaintiff's complaints against Mr. Moore and Ms. Worley, the only one which even approaches the level of a "significant change in employment status" is the alleged threat by Mr. Moore to remove Plaintiff from her compensation plan. All of the other complaints constitute little more than Plaintiff's own subjective opinion that she was not being treated well enough. This type of conclusory and self-serving assertion, however, is simply not sufficient to establish an adverse employment action and defeat summary judgment. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996). As this Court has previously noted: "[a]lthough actions short of termination may constitute an adverse employment action within the meaning of [Title VII] … not everything that makes an employee unhappy is an actionable adverse action." Settle v. Baltimore County, 34 F.Supp.2d 969, 989 (D. Md. 1999). Thus, virtually all of Plaintiff's allegations of retaliation, at most, go to her claim for constructive discharge, and do not give rise to independent adverse actions.

As to Plaintiff's claim that Mr. Moore threatened to remove her from compensation, it must be recognized that this was, at most, a threat; Plaintiff was never actually removed from compensation. (*Moore Affidavit (Ex. D) at ¶ 5*). To the contrary, Mr. Moore himself did not even have the authority to take such action, and needed the approval of both Human Resources and the President of North America Sales to effectuate such a change. (*Id.*).[6] This Court has

---

[6] Mr. Moore denies ever even threatening to remove Plaintiff from the Compensation Plan, and his efforts to ensure that Plaintiff received a transition compensation plan when she transferred to Lucent's Government team, at the expense, in part, of the Verizon team, undermines Plaintiff's unsupported claim to the contrary. (*Plaintiff Depo. (Ex. A) at 308 line 28 - 309 line 5, 319 lines 5-10 and Depo. Ex. 7; Moore Affidavit (Ex. D) at ¶¶ 5-6*). Although Plaintiff's allegations must generally be taken as true for purposes of summary judgment, Plaintiff's own self serving assertions, contradicted by the record evidence, are simply not sufficient to defeat a motion for summary judgment. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996); Felty v. Graves-Humpheys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

previously indicated that a potential, but unconsummated, employment action does not constitute an adverse employment action, and is therefore insufficient to meet the prima facie requirements of a retaliation claim. See Haynie v. St. Mary's County, 2001 WL 194297, * 8 (D. Md. 2001) (noting that an attempted transfer does not constitute an adverse employment action). Thus, once again, this allegation of retaliation does not independently constitute an adverse action, but at most can merely be used by Plaintiff to support her claim for constructive discharge.

As a result, the only potentially legally cognizable action within the limitations period is Plaintiff's asserted constructive discharge. To argue that she was constructively discharged by Lucent, however, Plaintiff faces two steep factual hurdles. First, she must establish that she was essentially forced to transfer to the Government team from the Verizon team because of the actions of Mr. Moore and Ms. Worley. Second, she must then establish that, despite being granted the transfer which she herself had requested, she was nevertheless left with no reasonable alternative but to resign from the Government team a mere six weeks later. A review of the record establishes that Plaintiff is unable to overcome either hurdle.

Constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Nichols v. Harford County, 189 F. Supp. 2d at 345 (citations and quotations omitted). In order to establish constructive discharge, a plaintiff must prove both: (1) deliberateness of the employer's action; and (2) intolerability of working conditions. See id. (citing Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). With respect to the first element, a plaintiff must present "proof of the employer's specific intent to force the employee to leave." Bristow, 770 F.2d at 1255. With respect to the second element, whether the plaintiff's working conditions were intolerable "is assessed by the objective standard of whether a reasonable person in the plaintiff's

16

position would have felt compelled to resign." Id. See also Nichols v. Harford County, 189 F.

Supp. 2d at 346 (quoting Taylor v. Virginia Union University, 193 F.3d 219, 237 (4th Cir.

1999)).

As to the first element of a constructive discharge claim, Plaintiff has no evidence

whatsoever that either Mr. Moore or Ms. Worley had any "specific intent" to force her to leave

Lucent. To the contrary, had Mr. Moore or Ms. Worley wished to "force" Plaintiff out, they

could have included her in either of the two downsizings on the Verizon team in February and

March of 2001. The undisputed evidence, however, establishes that she was not a target of either

of these downsizing efforts, and in fact was never once in jeopardy of losing her job during 2001.

(Plaintiff Depo. (Ex. A) at 229 lines 3-15; Moore Affidavit (Ex. D) at ¶ 4).

As to the second element of a constructive discharge claim, Plaintiff's subjective

perception that her working conditions at the time of her resignation were intolerable is not

enough to defeat summary judgment. As the courts of this District and Circuit have held,

"dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or

unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."

Nichols v. Harford County, 189 F. Supp. 2d at 346 (quoting Taylor, 193 F.3d at 237). As the

Fourth Circuit wrote in Bristow:

> [T]he law does not permit an employee's
> subjective perceptions to govern a claim of
> constructive discharge. Every job has its
> frustrations, challenges and disappointments;
> these inhere in the nature of work. An employee
> is protected from a calculated effort to pressure
> him into resignation through the imposition of
> unreasonably harsh conditions, *in excess of
> those faced by his co-workers*. He is not,
> however, guaranteed a working environment
> free of stress. The employment discrimination
> laws require as an absolute precondition to suit

that some adverse employment action have
occurred. They cannot be transformed into a
palliative for every workplace grievance, real or
imagined, by the simple expedient of quitting.

770 F.2d at 1255 (emphasis added).

Plaintiff may have felt that she was unfairly treated by Mr. Moore and Ms. Worley, and

that she was in danger of being removed from compensation, but "dissatisfaction with [among

other issues] work related stress and promotion opportunities" does not rise to the level of

intolerable working conditions. McCain, 115 F. Supp. 2d at 576. It is undisputed that Plaintiff

was not downsized like countless numbers of her co-workers; that she was given the very

transfer that she requested; and that Mr. Moore was actually trying to ensure that she received a

transition compensation plan, even though he was not required to do so. From an objective

standpoint, Plaintiff's claim of constructive discharge thus fails as a matter of law.

Finally, it must be emphasized that, to satisfy the prima facie requirements, Plaintiff must

establish not only that Mr. Moore and Ms. Worley deliberately made Plaintiff's working

conditions so intolerable that she was forced to transfer to the Government team, but also that her

working conditions remained so intolerable after her transfer that she reasonably had no

alternative but to resign from Lucent in May of 2001. The undisputed facts, however, establish

that Plaintiff requested a transfer to the Government team to a position with compensation

growth potential; that Mr. Moore approved such transfer, even though he had the authority to

refuse Plaintiff's request; and that Mr. Moore was in the process of approving a transition

compensation plan for Plaintiff which would have made up most, if not all, of Plaintiff's lost

commission for at least a year, if not longer. (*Plaintiff Depo. (Ex. A) at 305 line 14 - 306 line 3,*

*308 line 28 - 309 line 5, 319 lines 5-10 and Depo. Ex. 7; Moore Affidavit (Ex. D) at ¶ 6; Loprete*

*Depo. (Ex. E) at 31 lines 11-19).* Again, from an objective standpoint, this simply does not describe intolerable working conditions on the Government team.

In response, Plaintiff seems to rely upon her allegation that on April 14, 2001, after her transfer to the Government team, Mr. Moore said to her: "I can get you back in my team at any time, you're not safe." (*Plaintiff Depo. (Ex. A) at 332 line 8 - 333 line 6).* Mr. Moore denies having ever made such a statement, and in fact, did even not have the authority to transfer Plaintiff back to the Verizon team without obtaining additional approvals. (*Moore Affidavit (Ex. D) at ¶ 7).* Plaintiff's allegation is thus not only objectively untrue, but also illogical. Why would Mr. Moore have approved Plaintiff's transfer and expended time and effort on ensuring that she received a transition compensation plan to which she was not otherwise entitled, if he intended to "get her back?" Plaintiff maintains that Mr. Moore wanted Plaintiff back on the Verizon team "so that he could fire me;" but then why would he not simply have down-sized her in February or March, or have denied her transfer to the Government team in the first instance? (*Plaintiff's Depo. (Ex. A) at 424 line 21 – 425 line 1).* Moreover, other than Plaintiff's uncorroborated recollection of this alleged statement, there is no evidence that Mr. Moore ever took any action to accomplish this threat. Although summary judgment standards require the Court to assume the truth of Plaintiff's allegation, the standards do not require the Court to accept illogical assertions by Plaintiff. As a matter of law, Plaintiff's claim for constructive discharge is unsupportable, and should be summarily dismissed.

### b.    Plaintiff Cannot Establish a Causal Connection

Even if Plaintiff was able to prove that she was constructively discharged, her retaliation claim nevertheless fails for lack of proof of a causal connection. In order to establish a causal connection, Plaintiff must establish that Lucent took adverse action against her "because [she]

engaged in a protected activity." See Nichols, 189 F. Supp. 2d at 344 (quoting Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)).  This Court has noted that what constitutes a causal connection "depends largely on the particular facts and circumstances of the case," and that factors "may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees." Id. (citation omitted).  In the present matter, however, none of these factors are present, and there is no evidence that connects the events of 2001 with Plaintiff's complaints about Mr. in 1999, the only protected activity in this matter.

Plaintiff is unable to point to any differential treatment between Plaintiff and other similarly situated individuals.  To the contrary, Plaintiff actually asserted during her deposition that another female employee who complained about Mr. Herr's conduct was given mentoring which Plaintiff felt that she herself should have received, a complaint which effectively undermines Plaintiff's claim that individuals who complained against Mr. Herr were adversely affected. (*Plaintiff Depo. (Ex. A) at 205 lines 3-5 and 205 line 15 – 206 line 1*).

Plaintiff also has no evidence of "inconsistent reasons" offered by Lucent for any alleged adverse action (assuming, of course, that any legally cognizable adverse action even occurred), or of any "intervening pattern of retaliatory conduct" between Plaintiff's complaints about Mr. Herr in 1999 and the alleged constructive discharge in 2001.  To the contrary, Plaintiff has no complaints about the intervening year during which she was under the supervision of Mr. McFaul and Mr. Donaldson.  Such a lengthy intervening period devoid of retaliatory issues significantly undermines Plaintiff's claim of a causal connection.

The final <u>Nichols</u> factor to consider is temporal proximity. The evidence is clear that Mr. Moore spoke to Mr. May, Human Resources Director, about Plaintiff's issues with Mr. Herr in late 1999. (*Moore Depo. (Ex. B) at 26 lines 16-21*). Plaintiff's allegations of retaliation do not begin until 2001, over a year after Mr. Moore had knowledge of Plaintiff's complaints against Mr. Herr. "[A] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... negates any inference that a causal connection exists between the two." <u>Church</u>, 180 F. Supp. 2d at 745 (<u>quoting</u> <u>Dowe</u>, 145 F.3d at 657) and cases cited therein. Plaintiff is thus unable to meet her prima facie obligation of proving a causal connection, and her retaliation claim therefore fails as a matter or law.

**2.    <u>Plaintiff is Unable to Establish a Prima Facie Case<br>of Gender Discrimination</u>**

In order to establish a prima facie case of gender discrimination, the plaintiff must establish that:

(1) the employee is a member of a protected class;

(2) the employee was qualified for the job and her performance was satisfactory;

(3) in spite of her qualifications and performance, the employee suffered an adverse employment action; and

(4) the employee was treated differently from similarly situated employees.

<u>See</u> <u>Finnegan</u>, 184 F. Supp. 2d at 461. Plaintiff's inability to establish a legally sufficient adverse action has already been discussed in detail as to Plaintiff's claim of retaliation, and Plaintiff's claim for gender discrimination fails at the prima facie level under this same analysis.

Even if she were able to establish that Lucent took a legally cognizable adverse action against her, however, Plaintiff's claim of gender discrimination still fails because she is also

21

unable to show that she was treated differently from similarly situated employees. With respect to her constructive discharge claim, Plaintiff has pointed specifically to no similarly situated male employees who were treated better than she. This is unsurprising given the fact that virtually every Verizon team member was equally concerned over their jobs during this period of massive downsizing. Moreover, the undeniable fact that Plaintiff's direct supervisor at the time of her transfer, Ms. Worley, was a woman, makes it exceedingly difficult for Plaintiff to establish a prima facie case of gender discrimination based on her alleged constructive discharge. See Demesme v. Montgomery County Government, 63 F. Supp. 2d 678, 683 (D. Md. 1999) (noting that the "fact that the decision makers were of the same protected class suggests no discriminatory motivation"). Plaintiff's claim of gender discrimination thus fails at the prima facie level as a matter of law.

3. **Plaintiff is Unable to Establish that Lucent's Legitimate, Non-Retaliatory and Non-Discriminatory Reasons for its Actions were Mere Pretext for Either Intentional Retaliation or Gender Discrimination**

Even if Plaintiff could establish a prima facie case of either retaliation or gender discrimination, Lucent has clearly put forward legitimate, non-retaliatory and non-discriminatory reasons for its actions. Plaintiff's performance as the Supplier Diversity Account Manager was causing Lucent to lose money, and her supervisors were justifiably evaluating and addressing these performance issues. Despite these concerns, however, Plaintiff was not down-sized, and her job was never in jeopardy. To the contrary, the undisputed facts establish that Plaintiff was given the very transfer that she requested (even though Mr. Moore could have refused), and that she then resigned from Lucent only six weeks later to take a better-paying and more challenging position at Signal.

With these legitimate reasons established, Plaintiff bears the burden of showing that Lucent's proffered reasons for its actions were not its true reasons, but were a mere pretext for intentional and prohibited gender discrimination and/or retaliation. See Langerman v. Thompson, 155 F.Supp.2d 490, 496 (D.Md. 2001); Chika, 179 F.Supp.2d at 581. In attempting to meet this burden, however, Plaintiff has woefully failed, and her claims should therefore be dismissed as a matter of law.

As to her claim of retaliation, Plaintiff is unable to establish that Lucent's legitimate reasons for its actions were a mere pretext for retaliation. To suggest that Mr. Moore, who had no relationship with Mr. Herr outside of work, would harbor a retaliatory animus against Plaintiff as a result of her complaints about Mr. Herr for over a year is nothing short of ridiculous. Nevertheless, Plaintiff seems to suggest exactly this in alleging that Mr. Moore in February of 2001 stated to her: "How does it feel to have your career ruined for no reason?" (Plaintiff Depo. (Ex. A) at 423 lines 2-10). Mr. Moore strenuously denies ever making this alleged statement. (Moore Affidavit (Ex. D) at ¶ 6). Even if it is assumed for sake of the present Motion that Mr. Moore actually made this statement, however, it is undeniable that, after making the statement, Mr. Moore nevertheless approved Plaintiff's transfer to the Government team and approved her transition compensation plan. This statement thus does not establish that Plaintiff was constructively discharged after her transfer to the Government team. As such, the statement does not establish pretext as to the ultimate issue in this matter.

Other than this one alleged statement, Plaintiff's only evidence of pretext is her perceived difficulties working with Mr. Moore and Ms. Worley. This Court has specifically noted, however, that: "since supervision and [retaliation] are very different ... a [retaliatory] animus cannot be inferred from the day-to-day conduct of supervisors that [plaintiff] may deem

inconvenient, inconsiderate or insufficiently solicitous." <u>Settle v. Baltimore County</u>, 34 F. Supp. 2d 969, 993 (D. Md. 1999) (<u>quoting</u> <u>Copeland v. Sears, Roebuck and Co.</u>, 25 F. Supp. 2d 412, 418 (S.D.N.Y. 1998)).  Plaintiff's claim for retaliation thus fails as a matter of law.

As to her claim of gender discrimination, Plaintiff in her deposition conceded that she herself is not even certain if Mr. Moore and Ms. Worley took any action against her because of her gender.  (*Plaintiff Depo. (Ex. A) at 403 line 7 – 404 line 9*).  The only gender based comment which Plaintiff is aware of Mr. Moore uttering was when he indicated to Plaintiff that a Woman's supervisors should judge her based upon her performance, not her appearance.  Such "evidence" hardly supports an allegation of gender discrimination.

In the final analysis, it is also critical to remember that Plaintiff was never fired by Lucent, but rather voluntarily resigned.  The undisputed evidence clearly establishes that Plaintiff left Lucent to accept a higher level position with Signal, a position which gave her the opportunity to create an entire new division and to earn tens of thousands of dollars in excess of what Plaintiff estimated she would have made in 2001 if she had stayed at Lucent.  The fact that Plaintiff has also sued Signal, claiming that she was fraudulently induced to leave Lucent, only serves to further undermine any reasonable contention that she was constructively discharge. Under such circumstance, Plaintiff's case should be dealt with summarily.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Lucent's Motion for Summary Judgment should be granted in its entirety and judgment should be entered in favor of Lucent and against Plaintiff as a matter of law.

Respectfully submitted,

_____/s/_____

Robert R. Niccolini
McGuireWoods LLP
7 St. Paul Street, Suite 1000
Baltimore, Maryland 21202
410-659-4400

Counsel for Lucent Technologies Inc.

## CERTIFICATE OF SERVICE

I hereby certify that this the 18th day of August, 2003 a copy of Defendant's Memorandum of Points and Authorities in support of its Motion for Summary Judgment was electronically filed and was further served by United States Mail, postage prepaid, on:

Paul V. Bennett, Esquire
James E. Zuna, Esquire
133 Defense Highway, Suite 209
Annapolis, Maryland  21401

_____/s/_____

Robert R. Niccolini

LAB/382856

25