PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA BRYAN         *

     Plaintiff         *

v.         *      Civil Action No. AMD 03 CV 0265

LUCENT TECHNOLOGIES, INC.         *

     Defendant         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Lisa Bryan, Plaintiff, by and through her attorneys, Paul V. Bennett and James E. Zuna,

Jr., hereby submits this Memorandum of Law in Opposition to Lucent Technologies, Inc.

("Lucent"), Defendant's, Motion for Summary Judgment.

## I. Summary of Claims

In this case, plaintiff alleges violations of 42 U.S.C. §2000e, et. seq., claiming that she was

sexually harassed on the job by her supervisor, that when she complained about the harassment,

her employer failed to carry out an adequate and effective response, that the harassment

consequently continued and her subsequent continuing complaints were either ignored and/or

were the basis for illegal retaliation against her on the job. Plaintiff further alleges that she was

discriminated against by her employer based on her gender and that, because of the hostility,

discrimination, harassment and retaliation, she was forced to transfer into a lower-paying position,

and was ultimately forced to resign.

## II. Summary of Law

It is well established that a motion for summary judgment will be granted only if there

1

PDFMAILER.COM  Print and send PDF files as Emails with any application, ad-sponsored and free of charge  www.pdfmailer.com

exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp*. *v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; See also *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co*., 181 F.2d.390, 394 (4th Cir.1950). "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R. Civ. P. 56 (c); *Pulliam*, 810 F.2d, at 1286 (citing *Charbonnages de France v Smith*, 597 F.2d 406 414(4th Cir. 1979)). When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. See, *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998), *Matsushita Elec. Indust. Co. v Zenith Radio Corp* ., 475 U.S.574, 587-88 (1986); *United States v. Diebold*, 369 U.S. 654, 655 (1962); *Poller v. Columbia Broadcasting Sys., Inc*., 368 U.S. 464, 473 (1962). Courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue.  Summary judgment disposition remains appropriate only if the plaintiff cannot prevail as a matter of law. *Ballinger v. North Carolina Agric. Extension Serv*., 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).

2

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

In order to defeat Defendant's Motion for Summary Judgment, plaintiff must establish a *prima facie* case of discrimination or harassment and demonstrate that the employer's claimed legitimate nondiscriminatory reasons for its actions was merely a pretext to mask its unlawful discriminatory motives. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)*; Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981); *St. Mary's Honor Center v. Hicks,* 113 S.Ct. 2742 (1993).

### III.  Statement of Facts

**A.     Plaintiff's Employment History With Lucent Through October of 1998.**

Lucent is a corporation engaged in the design, manufacture, and sale of telecommunications equipment, and throughout the relevant period of time maintained an office in Linthicum, Maryland.  (Complaint and Answer at ¶¶ 4.)  Plaintiff was originally hired by New York Telephone, a predecessor of Lucent, in or about February of 1978 as a telephone switchboard operator.  (Deposition of Lisa Bryan, attached hereto as Exhibit 1, page 13, line 7 – line 15, page 14, line 17 – page 15, line 5). 1

In or about 1979, Plaintiff became a manager and then floor manager in New York Telephone's Operator Services Department, which position she held until 1985.  (Id., page 13, line 13 – page 14, line 5).  In or about 1984/1985, Plaintiff was named as an account executive in New York Telephone's Product Sales Department.  (Id., page 14, lines 5 – 8).  On or about October 1, 1998, Plaintiff was promoted and transferred to a position in Maryland on Lucent's Verizon Customer Service Team.  (Id., page 20, lines 2 – 11).  Plaintiff was originally transferred

---

1 Plaintiff testified at deposition as to Lucent's corporate history, insofar as how Lucent evolved after a period of mergers and corporate "spin-offs" between Lucent and related, or predecessor companies.  Plaintiff further testified that from 1978 through May of 2001, Plaintiff was employed either by Lucent or by one of its predecessor companies.

3

into a position as a contract manager, with responsibility for reviewing various contracts.  (Id., page 20, line 12 – page 21, line 5).  However, within two weeks of Plaintiff's transfer, Plaintiff was informed that Mr. Rick Smith, Plaintiff's immediate supervisor and the person who hired her, was being demoted.  (Id., page 27, line 4 – page 28, line 15).  As a result, Plaintiff was named as an account manager on Lucent's Verizon Customer Team Y2K project.  (Id., page 31, lines 6 – 8).

In or about October of 1998, Mr. Chris Herr was promoted within Lucent to the position of C-Level Manager, and was given supervision of several projects, including Lucent's "Y2K" project.  Thus, Mr. Herr came to directly supervise Plaintiff, as well as Ms. Jennifer Mazzarello, Mr. Jim McIlvaine, and Mr. Larry Dorr.  (Id., page 33, line 4 – page 34, line 9; Deposition of Jennifer Mazzarello, attached hereto as Exhibit 2, page 42, line 20 – page 43, line 3; Deposition of Chris Herr, attached hereto as Exhibit 3, page 54, line 21 – page 55, line 19).

B.    **Plaintiff's Supervision Under Chris Herr Was Characterized by Repeated Offensive Conduct.**

Throughout Plaintiff's employment with Lucent, Plaintiff consistently received favorable performance evaluations, and was considered to be a good employee.  (See Performance Reviews and Evaluations, attached hereto as Exhibit 4; Deposition of Richard McFaul, attached hereto as Exhibit 5, page 38, line 3 – 39, line 18; Deposition of Tom Moore, attached as Exhibit 6, page 216, lines 8 - 13).  Despite Plaintiff's high level of performance, between October of 1998 and August of 1999, Mr. Herr engaged in a pattern of offensive and inappropriate conduct towards Plaintiff and Ms. Jennifer Mazzarello. For example, part of Ms. Bryan's job included

---

(Deposition of Lisa Bryan, page 22, line 21 – page 24, line 9).

reporting on business issues to Mr. Herr. On several occasions between October of 1998 and July of 1999, when she reported what Mr. Herr believed was good news, Mr. Herr said to Plaintiff, "Tell me more, you're giving me a woody." (Bryan depo, page 120, line 5 – page 125, line 20). 2 Mr. Herr mentioned on several occasions that Ms. Carol Spurrier (Lucent's Vice President of North America) made his "sphincter twitch." Mr. Herr invariably would follow up this comment with a hand gesture in which he would repeatedly open and then clench his fist. (Id., page 127, line 16 – page 128, line 8; Mazzarello depo, page 122, line 5 – page 123, line 3). On several occasions, Mr. Herr stated to Plaintiff after meetings with female Lucent managers that the female managers had their "panties in a ruffle." (Bryan depo, page 136, line 16 – 138, line 1; Mazzarello depo, 2/27/03, page 145, line 13 – page 146, line 9). 3 Between January and May of 1999, Mr. Herr repeatedly stated to Plaintiff that he kept an empty bottle in his desk, so that he would be able to relieve himself during lengthy conference calls. (Bryan depo, page 130, line 1 – page 132, line 12; Mazzarello depo, 2/27/03, page 124, line 6 – 19). Subsequently, on several occasions, Mr. Herr walked past Plaintiff's desk waving an empty bottle in front of her. (Bryan depo, page 133, line 4 – page 136, line 5; Mazzarello depo, 2/27/03, page 127, line 7 – page 128, line 3). Mr. Herr made this same comment to Ms. Dawn Dugan and Ms. Kelly Hanlon after Ms. Dugan came to the Verizon Customer Team in or about December 2000 (Deposition of Dawn Dugan, attached hereto as Exhibit 7, page 15, lines 2-3, page 27, line 12 - page 28, line 17, page 114, lines 16 - 18).

---

2 Mr. Herr admitted to using the term "woody" on one occasion in the presence of Ms. Mazzarello. (Deposition of Chris Herr, page 69, line 15 – page 70 line 16).

3 Mr. Herr denies using the phrase, "panties in a ruffle." Mr. Herr did however admit to using the phrase "knickers in a knot" frequently, and on at least one occasion in reference to Ms. Sarah Brazier. (Herr depo, page 79, line 17 – page 82, line 21).

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

During this time frame, Mr. Herr was commuting between Connecticut and Lucent's Linthicum, Maryland office. On one occasion, Mr. Herr requested that Ms. Bryan accompany him to a hotel room, so that he could pick up his packed bag and check out. Mr. Herr had in fact not packed yet, and proceeded to display his underwear to Plaintiff. (Bryan depo, page 115, line 1 – page 116, line 4. Herr depo page 94, line 12-18). 4

Throughout the relevant period of time, Mr. Herr continually referred to Plaintiff as "Big Girl" and Ms. Mazzarello as "Little Girl." (Bryan depo, page 116, line 5 – page 118, line 11; Mazzarello depo, 2/27/03, page 118, line 11 – page 119, line 7; Herr depo, page 63, line 17 – page 64, line 21, page 67, line 3 – line 18). In or about January of 1999, Mr. Herr stated to Plaintiff and Ms. Mazzarello that he and a client often attended nudist camps together, and that when Mr. Herr was transferred to Maryland, the same client gave Plaintiff a "blow-up" doll as a parting gift." (Bryan depo, page 100, line 10 – page 103, line 4; Mazzarello depo, 2/27/03, page 102, line 10 – page 104, line 9).

In or about January of 1999, Mr. Herr scheduled and conducted a "team lunch" with Mr. Jim McIlvaine and Mr. Larry Dorr, but excluded Plaintiff and Ms. Mazzarello.[5] On or about April 13, 1999, Plaintiff, Ms. Mazzarello, and Mr. Herr traveled to a hotel in New Jersey for a business trip. During the trip, Mr. Herr advised that he had not booked a room at the hotel and asked Plaintiff and Ms. Bryan as to which of the two he would be sharing a room with. (Bryan depo, page 109, line 2 – page 112, line 9; Mazzarello depo, 2/27/03, page 111, line 19 – page

---

4 Mr. Herr also displayed his underwear to Ms. Mazzarello on a separate occasion. (Mazzarello depo, page 128 lines 4-16; Herr depo, page 98, line 20 - page 99, line 1).

5 Mr. Herr invited Plaintiff and Ms. Mazzarello to a similar meeting only after being confronted with the issue by Plaintiff. (Bryan depo, page 103, line 19 – page 105, line 10; Mazzarello depo. 2/27/03, page 106, line 9 – page 109, line 16).

114, line 6). In or about April of 1999, Mr. Herr inexplicably told Plaintiff that he had dreamt about her the previous night and was awakened by Mr. Herr's wife after calling out Plaintiff's name in his sleep. (Bryan depo, page 106, line 21 – page 109, line 1).

Throughout the period of time in which Mr. Herr supervised Plaintiff, Mr. Herr required Plaintiff to perform menial tasks that he did not require of other, male, team members, in addition to Plaintiff's regularly assigned duties. Mr. Herr required Plaintiff to pick him up from the airport, drive him to the airport, buy him food, transport him to and from his hotel, confirm hotel and travel reservations, insure that Mr. Herr attended certain meetings, insure that Mr. Herr checked out of his hotel room on time, and coordinated Mr. Herr's training. These tasks were all assigned to Plaintiff despite the fact that Mr. Herr had a secretary at the time. (Bryan depo, page 178, lines 6-21, page 180, lines 1-11).

Throughout the period of time in which Mr. Herr supervised Plaintiff, Plaintiff repeatedly requested that Mr. Herr modify his behavior toward her, and advised that she did not welcome his comments. Plaintiff routinely corrected Mr. Herr after he made an offensive statement, or walked out of his office. (Bryan depo, page 108, lines 12-16; Deposition of Linda Zachmann, attached hereto as Exhibit 8, page 25, lines 4-8). Ms. Mazzarello also met with Mr. Herr on May 27, 1999, in order to discuss her discomfort with Mr. Herr's conduct. After the lunch meeting, Mr. Herr sent an e-mail to Ms. Mazzarello acknowledging the inappropriateness of his language, and asked her to "keep the bar high." (See 5/27/99 e-mail from Chris Herr, attached hereto as Exhibit 9). Ms. Mazzarello shared the details of her meeting with Ms. Bryan, as well as Mr. Herr's subsequent e-mail message. (Affidavit of Lisa Bryan, attached hereto as Exhibit 10). Despite Mr. Herr's acknowledgement of his inappropriate conduct, Mr. Herr continued to conduct himself in

PDFMAILER PDF jinniffy with PDFmailer add-on, free colored and blank brochure PDFmailer here

the same manner towards Plaintiff and Ms. Mazzarello.

In or about July of 1999, Plaintiff met with Mr. Herr and requested a transfer away from his supervision due to Mr. Herr's continuing offensive comments and conduct, as well as occasions in which Mr. Herr had requested that Plaintiff falsify expense vouchers for Mr. Herr. (Bryan depo, page 138, lines 12-18, page 179, lines 9-11, page 192, line 8 - page 195, line 18). During the course of the meeting, Plaintiff presented to Mr. Herr an outline of issues that she had with his conduct toward her.  (Bryan Affidavit; Outline of Issues, attached hereto as Exhibit 11). Mr. Herr responded by stating that Plaintiff was too valuable to his team, and raised the possibility of Plaintiff handling her duties on the Y2K project while being supervised by another manager. (Bryan depo, page 138, line 12 – page 139, line 20).

Within an hour of Mr. Herr's meeting with Ms. Bryan, Mr. Herr contacted his supervisor, Ms. Sarah Brazier, and Mr. Ed May, who was at that time Lucent's Human Resource Director. Mr. Herr misrepresented to Ms. Brazier and Mr. May that Ms. Bryan wanted to leave the Verizon Customer Team altogether. (Herr depo, page 143, lines 11-15).  On the day after her meeting with Mr. Herr, Plaintiff was contacted separately by Ms. Brazier and by Mr. May. Both Ms. Brazier and Mr. May advised Plaintiff that Mr. Herr had told them that Plaintiff wished to be taken off of the Verizon Customer Team.  (Bryan depo, page 141, lines 16-19).

As a result of these conversations, Plaintiff requested to meet with Mr. May and Ms. Brazier to discuss her concerns. Plaintiff sought the advice of Mr. Richard McFaul, who was employed by Lucent as a C-Level manger, and someone Plaintiff had befriended.  (Bryan depo, page 144, line 13-16)  After conveying her concerns related to Mr. Herr's conduct, Mr. McFaul advised Plaintiff not to disclose the totality of Mr. Herr's conduct, but only to relate enough

allegations to insure that Plaintiff would be transferred from his supervision. (Bryan depo, page 143, line 20 – page 145, line 3).

In or about July of 1999, Plaintiff spoke separately with Ms. Sarah Brazier and Mr. Ed May regarding the aforementioned conduct of Mr. Herr sharing with both the documented allegations that Ms. Bryan had created. (Id., page 146, lines 16 – 19; Exhibit 11). Ms. Brazier acknowledged that Mr. Herr was "rough around the edges" with his language, but stated that she did not realize his conduct was so bad. (Bryan depo, page 149, line 19 - page 150, line 1). Ms. Brazier acknowledged that Lucent managers should be more aware of their surroundings. (Bryan depo, page 150, lines 2 – 8). Ms. Brazier indicated to Ms. Bryan that there was a possibility that Plaintiff would be able to transfer to a position on Lucent's Supplier Diversity Program, which Plaintiff accepted on the next day. (Id., page 150, line 2 – page 151, line 9). Ms. Mazzarello later informed plaintiff that Mr. Herr had been verbally reprimanded by Mr. May, and ordered to undergo sensitivity training. However, Plaintiff was never informed by Ms. Brazier, Mr. May, or anyone else at Lucent as to what disciplinary action, if any, was taken against Mr. Herr. (Id., page 153, line 19 – page 156, line 8).[6]

## C. Mr. Chris Herr's Behavior Towards Plaintiff Following Transfer was a Continuation of the Same Kind of Misconduct.

After Plaintiff complained about Mr. Herr's conduct to Ms. Brazier and Mr. May, Plaintiff

---

6 Mr. Herr testified in deposition that he had received a verbal reprimand from Mr. Ed May, and that he was informed that a record of the incidents involving Plaintiff and Ms. Mazzarello would be placed in his file. (Herr depo, page 144, line 7 – page 145, line 5). During the course of discovery in this matter, Defendant was asked to provide a copy of Mr. Herr's personnel file. In response, Defendant has indicated that it has been unable to locate Mr. Herr's personnel file. Consequently, there has not as of this date been provided to Plaintiff a written reprimand for Mr. Herr's aforementioned conduct. Mr. Herr testified that he was ordered to undergo sensitivity training, (Herr depo, page 144, lines 7 – 14) but no record has been produced that would document the fact that he was ever actually required to do so.

PDFMAILER.DE  Print und versenden Sie Ihres Dokuments als PDF, kostenlos und werbegesponsert  www.pdfmailer.de

was left without either a first or second line supervisor, and was still required to interact with Mr.

Herr with regard to the Y2K project until October of 1999. (Id., page 156, line 7 – page 157, line

2). 7 Plaintiff was further required to meet with Mr. Herr in December of 1999 in order to

conduct Plaintiff's performance evaluation for 1999, despite being officially removed from his

supervision in August. (Bryan depo, page 199, lines 7 – 9, page 200, line 7 – page 202, line 10;

Herr depo, page 217, line 14 – page 218, line 3). Plaintiff was further required to interact with

Mr. Herr in her new role with Lucent's supplier diversity program, by the nature of Mr. Herr's

position as a C-Level manager. (McFaul depo, page 134, lines 1-4). Additionally, Plaintiff was

required to interact with Mr. Herr during normal sales meetings, client meetings, company picnics,

executive meetings related to quarterly read-outs by executives, and in the normal course of

working in the same office, on the same floor. (Bryan Affidavit).

Notwithstanding Plaintiff's removal from Mr. Herr's supervision and the alleged

reprimand and order for sensitivity training, Mr. Herr continued to make comments in Lucent's

Linthicum office toward Plaintiff and in reference to the fact that Plaintiff and Ms. Mazzarello had

complained about his conduct. In meetings Mr. Herr would make snide remarks under his breath

towards Ms. Bryan, or would make comments to the effect of "there she goes again" after

Plaintiff made a statement. (Bryan depo, page 192, lines 2-7). On numerous occasions after

being removed from his supervision, Ms. Mazzarello heard Mr. Herr state to other individuals,

"I'm a new man. I've been to charm school," ostensibly in reference to the sensitivity training

that Mr. Herr was allegedly ordered by Mr. May to take.[8] (Mazzarello depo, page 85, line 17 –

---

7 Plaintiff was in fact without a first or and second line supervisor until January of 2000, when she was again placed under the direct supervision of Mr. Dick McFaul. (Bryan depo, page 40, line 21 – 47, line 7).

PDFMAILER.de   Print and convert to PDF with www.pdfmailer.de censored via www.pdfmailer.de

page 86, line 13).  Plaintiff was made aware of these comments at the time.  (Bryan Affidavit).

  In or about September of 1999, Mr. May came into the Linthicum office.  When Mr. Herr saw him, Mr. Herr stated to Mr. May (and in front of other employees) that "That's the man who ruined my career," in reference to the allegations made by Plaintiff and Ms. Mazzarello in relation to Mr. Herr's conduct. (Mazzarello depo, page 87, line 17 – page 88, line 10).  Again, Plaintiff was made keenly aware of Mr. Herr's statements.  Near the end of 1999, Ms. Bryan received a phone call from Mr. Jim McIlvaine, a co-worker of Plaintiff and Ms. Mazzarello on the Verizon customer team.  During that conversation, Mr. McIlvaine advised Plaintiff that Mr. Herr had stated that Plaintiff and Ms. Mazzarello could not participate in the Y2K rollover on December 31, 1999 because they were "suing him for sexual harassment."  (Bryan Affidavit).  In or about the end of 1999 and the beginning of 2000, Ms. Mazzarello advised Plaintiff that she was further informed by Mr. Larry Dorr, another co-worker of Ms. Mazzarello and Plaintiff, that Mr. Herr had stated that Plaintiff and Ms. Mazzarello were no longer under Mr. Herr's supervision because they were "suing him for sexual harassment."  (Mazzarello depo, page 88, line 16 – page 90, line 8; Bryan Affidavit).

**D.**  **Plaintiff's Supervision By Tom Moore and Pam Worley was More of the Same.**

  Prior to July or August of 2000, Mr. Tom Moore was employed by Lucent as an Executive Assistant to Ms. Carole Spurrier, who was at that time Lucent's Vice President for North America East.  (Moore depo, page 9, lines 4-19).  In or about 1999, after Plaintiff and Ms.

---

8 There is conflicting testimony as to whether Mr. Herr in fact attended sensitivity training, and when that training allegedly occurred.  During his deposition, Mr. Herr testified alternatively that he attended sensitivity training in the late winter/early spring of 2000, or that he attended sensitivity training in or about October of 1999.  (Herr depo, page 16, line 6 – through page 17, line 3; page 23, line 13 – page 24, line 9; page 219, line 20 – page 220, line 16).  However, Mr. Tom Moore testified during his deposition that Mr. Herr had advised Mr. Moore that he had not completed his diversity training as of July 2000, nearly one year after Plaintiff and Ms. Mazzarello initially complained about Mr.

PDFMAILER.FR   Imprimez et créez des PDFs avec PDFMAILER gratuitement   www.pdfmailer.fr

Mazzarello were transferred from Mr. Herr's supervision, Ms. Mazzarello was invited by Mr.

Moore to enter into a mentoring relationship with him, ostensibly so that Ms. Mazzarello would

be able to fine-tune her job skills so that she could be promoted one to two levels within a 12-

month period of time.  (Mazzarello depo, 2/27/03, page 283, line 18 – page 294, line 1, page 281,

line 16 – page 282, line 1).  Ms. Bryan, however, was not afforded any such opportunity.  (Bryan

depo, page 205, line 3 – page 206, line 15).

        In or about August of 2000, Mr. Moore was transferred to the same team as Plaintiff as a

D-Level Director, a position that placed him in a supervisory capacity over both Plaintiff and her

immediate supervisor.  Mr. Moore repeatedly indicated that he did not believe the allegations that

Plaintiff and Ms. Mazzarello had made against Mr. Herr, and stated as much to Plaintiff.  (Bryan

Affidavit).  Mr. Moore further commented to Ms. Bryan and to other Lucent employees that he

did not believe the allegations made against Mr. Herr, stating, "boys will be boys."  (Affidavit of

Tammi Shapiro, attached hereto as Exhibit 12; Bryan depo, page 277 line 13- page 280, line 9).

        In the summer of 2000, Mr. Moore informed Plaintiff that she was being considered for an

Events Planner job for Carole Spurrier. (Zachmann depo, page 50, line 16 – page 51, line 3;

Moore depo, page 229 lines 9-13).  Based upon that representation, Plaintiff created a

presentation for Mr. Moore with regard to the events planner position, so that that Mr. Moore

could share it with other executives. During follow-up conversations with Mr. Moore after

Plaintiff submitted her presentation to him, Mr. Moore advised that the executives were still

reviewing the presentation.  In fact, Mr. Moore never shared the presentation with anyone.   It

was only after Ms. Linda Zachmann, who was at the time employed as Vice President Carole

---

Herr's conduct.  (Moore depo, page 47, line 20 – 49, line 14).

PDFMAILER.DE    Printen und Faxen kostenlos with PDFMAILER, Gesponsored onlineeinfach www.pdfmailer.de

Spurrier's Executive Assistant, received a copy of the presentation directly from Plaintiff that any executive received the presentation. (Bryan depo, page 215, line 14 – page 216, line 19; Zachmann depo, page 51, lines 2-3).

In or about October of 2000, Plaintiff was offered an opportunity for promotion to a C-Level manager with Lucent's global purchasing organization. When Mr. Moore learned that Plaintiff was considering the promotion, Mr. Moore asked Plaintiff not to accept it because Plaintiff was "too valuable" to his organization, and that she would be in line to receive a promotion to a C-Level manager's position within 18 months. Based upon Mr. Moore's representations, Plaintiff declined the promotion with the global purchasing group. (Bryan depo, page 217, line 21 – page 220, line 18).

In the time between her assumption of the Supplier Diversity Manager's position in October of 1999 and November of 2000, Plaintiff continued to be a highly successful and valuable employee. As a Supplier Diversity Manager, Plaintiff was responsible for raising and maintaining the percentage of women, disabled, minority, or veteran businesses utilized by Lucent, pursuant to a request or contract requirement of Verizon in their dealings with Lucent. (Bryan depo, page 54, line 6 – page 57, line 8). When Plaintiff assumed control of the Supplier Diversity Program, Lucent's supplier diversity percentage was at approximately four and a half to five percent. (Bryan depo, page 55, line 20 – page 56, line 4). Plaintiff was charged with increasing the percentage to 15%, and then to 16%, with a stretch goal of exceeding 16%. (See 2000 goals form, attached hereto as Exhibit 13, Bryan depo, page 55, lines 6 – 12). This goal was not only met, but was exceeded. By the beginning of 2001, Lucent's reported supplier diversity percentage was at approximately 24%. (Bryan depo, page 57, lines 14 – 19). This increase was

13

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

due in large part to Plaintiff's efforts in identifying businesses that Lucent was then doing business with that qualified as a diversity business, but had not been identified as such. (Bryan depo, page 58, line 8 – page 59, line 4). In the year-end ratings and rankings period that occurred in or about October of 2000, Plaintiff was rated sixth of all account managers. (See 2000 Ratings and Rankings, attached hereto as Exhibit 14; Bryan depo, page 222, line 6 – page 223, line 2).

On or about November 10, 2000, Lucent made an announcement by e-mail that the top seven account managers excluding Plaintiff, who had been ranked sixth out of all Account Managers, had been named as "account executives", were being placed on an enhanced compensation plan, and were being designated for heightened leadership opportunities. (See email from Tom Moore to Lisa Bryan, attached hereto as Exhibit 15; Bryan depo, page 223, line 11 – page 224, line 14; Exhibit 14). Mr. Moore informed Plaintiff by a separate e-mail that she was also considered to be a part of the account executive's group, but that she would be placed on an enhanced compensation plan different from the plan announced for the named account executives (Id.; Bryan depo, page 223, page 11- page 224, line 14; Exhibit 15). 9 Plaintiff thereafter received a compensation plan under the title of "channel manager", which had a lower target incentive than the account manager's plan. (Bryan depo, page 225, lines 7 – 20).

Shortly after Mr. Moore became Plaintiff's D-Level supervisor, Plaintiff and Ms. Mazzarello were placed under the direct supervision of Ms. Pam Worley. (Moore depo, page 122, lines 8-17). In or about January 16, 2001, during a discussion in which Ms. Bryan asked Ms. Worley for a vacation carry over form, Ms. Worley screamed in the middle of the office that Plaintiff and Ms.

---

9 As a result of Plaintiff receiving notice of her inclusion into the account executive's group by separate e-mail, Plaintiff was not formally included in the group, and as a result was excluded from meetings and leadership opportunities involving the group. (Bryan Affidavit).

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

Mazzarello "had a problem" with working under her supervision.  At the time of this statement,

Plaintiff had been working under Ms. Worley's supervision for less than a week.  (Bryan depo,

page 269, lines 17-18; Mazzarello depo, 2/27/03, page 239, line 11 – page 240, line 9).

 In the period of time after Plaintiff began her new position under the supervision of Ms.

Worley, Mr. Moore ordered Ms. Worley to investigate Plaintiff's and Ms. Mazzarello job

performance.  (Bryan depo, page 235, line 10 – page 235, line 17; Mazzarello depo, 2/27/03,

page 218, line 19 – page 219, line 3).  Subsequently, Plaintiff's job performance became

increasingly undermined.  For example, in or about January of 2001, Plaintiff was told by a

coworker that she was on the agenda to give a presentation the next day.  Ms. Worley had never

advised Plaintiff that she was to give the presentation, as would have been the routine.  (Bryan

depo, page 252, line 7 – page 253, line 11).  On occasion, Ms. Worley scheduled team meetings

that Plaintiff was not invited to.  Plaintiff also found that Ms. Worley would not read or respond

to most of Ms. Bryan's emails. (Bryan depo, page 254, line 16- page 255, line 4, Bryan Affidavit).

 Plaintiff also found that it was increasingly difficult for her to schedule appointments with Ms.

Worley.  (Bryan depo, page 253, page 16 – page 254, line 3).  Due to these difficulties, Plaintiff

met with Mr. Moore in or about January of 2001 to discuss her concerns.  During the course of

that discussion, Mr. Moore advised Plaintiff that he was glad that Plaintiff and Ms. Mazzarello

were being supervised by a woman, as he felt that their previous male supervisors had evaluated

Plaintiff and Ms. Mazzarello more for their appearance than for their brains or job performance.

(Bryan depo, page 240, lines 2 –21).

 During the period of time in which Mr. Moore supervised Plaintiff, Mr. Moore developed

nicknames of a sexual nature for employees, and condoned the use of such nicknames by other

PDFMAILER... produced with ... s with ... sored ... mail...

employees.  Mr. Moore was aware that Linda Crouse, C- Level Manager at Lucent who was in his organization, used the nickname "Zipper Nipples" in reference to Mr. Chip Yawney, an individual who Mr. Moore described as having "a middle-aged spread and was pulling his pants up really high."  Mr. Moore never counseled Ms. Crouse or talked to her about her comments.  In fact, Mr. Moore himself referred to Mr. Yawney as "Zipper Nipples" on more than one occasion. (Dugan depo, page 104, lines 10-20).

On February 14, 2001, Plaintiff met with Ms. Worley.  During the course of that meeting, Ms. Worley actually screamed at Plaintiff, and arbitrarily forbade her from meeting with customers. (Shapiro affidavit; Bryan depo, page 257, lines 7-13).  Ms. Worley further complained to Mr. Moore about Plaintiff, alleging that Plaintiff was insubordinate and withholding information from her.  (Moore depo, page 202, lines 8-11).

**E. Tom Moore's Apparent Romantic Relationship With Another Employee Led to Further Retaliation.**

In or about February of 2001, Mr. Moore requested that Ms. Mazzarello act as a mentor to Ms. Kelly Hanlon, who was at that time employed with Lucent as Mr. Moore's administrative assistant. (Moore depo, page 108, line 11 – page 109, line 14; Mazzarello depo, 2/27/03, page 199, lines 4-6).  In the course of this mentoring relationship, Ms. Mazzarello had also received information from other employees regarding Ms. Hanlon and Mr. Moore's behavior in the office.  Specifically, Ms. Mazzarello was advised by Ms. Tammi Shapiro and Plaintiff that they had on occasion observed Ms. Hanlon kneeling in front of Mr. Moore while Mr. Moore sat at his desk, that they had observed Ms. Hanlon sitting on Mr. Moore's armrest, that they had observed Ms. Hanlon and Mr. Moore whispering and giggling in the office; that Ms. Shapiro had

16

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

observed Ms. Hanlon return from a shopping excursion with Mr. Moore, after which Ms. Hanlon commented that Mr. Moore had purchased several items for her, and that Ms. Shapiro had observed Ms. Hanlon and Mr. Moore accompanying one another to lunch on several occasions. (Shapiro Affidavit; Bryan depo, page 213, line 20 – page 214, line 13).

Plaintiff further advised Ms. Mazzarello that she had been informed by Ms. Denise Panyick-Dale, a Lucent employee, that Ms. Panyick-Dale had observed Ms. Hanlon in Mr. Moore's office laughing behind closed doors and after business hours.  Ms. Panyk-Dale was uncomfortable with the way that Ms. Hanlon and Mr. Moore were behaving in the office.  (Bryan Affidavit; Deposition of Denise Panyick-Dale, attached hereto as Exhibit 16, page 32, lines 17-21). 10   Ms. Mazzarello was further advised by additional Lucent employees that the behavior of Ms. Hanlon and Mr. Moore in the office had become disruptive.  (Mazzarello depo, 2/27/03, page 207, lines 16-20).[11]  In addition to the above reports, Ms. Mazzarello was further aware of the

---

10 In her deposition, Ms. Hanlon admitted to drinking champagne with Mr. Moore in his office; to accompanying Mr. Moore to a "round table" executive's meeting; to accompanying Mr. Moore to a weekend charity dog walk; to attending a movie with Mr. Moore during business hours; and to jumping on a hotel room bed in Mr. Moore's presence. (Deposition of Kelly Hanlon, attached hereto as Exhibit 17, page 33, lines 2 – 21; page 38, line 9 – page 39, line 8; page 83, lines 4 – 21; page 84, line 9 – page 85, line 1; page 86, line 14 – page 87, line 3). Plaintiff's witnessing of Mr. Moore's conduct with Ms. Hanlon caused Plaintiff to become increasingly uncomfortable in the office, as Plaintiff would be forced to knock on Mr. Moore's door before entering his office, and then observe Ms. Hanlon walking from behind Mr. Moore's chair, or Ms. Hanlon kneeling at Mr. Moore's desk. (Bryan depo, page 213, line 18 – page 214, line 10).

11 Ms. Mazzarello was not the only Lucent employee to receive complaints regarding the conduct of Mr. Moore and Ms. Hanlon.  During her deposition, Ms. Laraine Scarpon, who had been employed as a Human Resources Manager for the Verizon Customer Team, testified that she had received numerous complaints from employees within Lucent regarding the conduct of Mr. Moore and Ms. Hanlon.  As a result of these complaints, Ms. Scarpon brought the issue to the attention of her supervisor, Mr. Ed May.  (Deposition of Laraine Scarpon, attached hereto as Exhibit 19, page 45, line 8 – page 47, line 22).  The fact that the conduct by Mr. Moore and Ms. Hanlon was disruptive to the office is further supported by Ms. Erica Adams.  Ms. Adams had been mentored by Mr. Moore, and had developed personal issues with Mr. Moore regarding what Ms. Adams perceived to be inappropriate comments about Ms. Adams' appearance, as well as Mr. Moore's contradictory career advice.  Ms. Adams had also observed Mr. Moore and Ms. Hanlon's conduct in the office but, unlike Plaintiff, never reported her concerns for fear of retaliation.  (See Affidavit of Erica Adams, attached hereto as Exhibit 20). Mr. Moore caused further discomfort in the office by asking female employees about their dating habits.  (Dugan depo, page 98 lines 7-15).

PDFMAILER ... produced with pdfmailer ... censored ... pdfmailer.com

conduct of Mr. Moore and Ms. Hanlon due to her own observations of their conduct, which she reported to Plaintiff, causing Plaintiff to feel uncomfortable as well. (Affidavit of Jennifer Mazzarello, attached hereto as Exhibit 18; Bryan Affidavit).

Plaintiff did not only speak to Ms. Mazzarello regarding the relationship between Mr. Moore and Ms. Hanlon. Plaintiff also reported the pair's conduct to Ms. Laraine Scarpon, who was at the time a human resources manager for the Verizon Customer Team. (Bryan depo, page 298, line 18 – page 299, line 1).

Based upon these reports and her observations, Ms. Mazzarello advised Ms. Hanlon to change her conduct with Mr. Moore in the office. (Mazzarello depo, page 207, line 7 – page 208, line 16). Shortly after providing this guidance to Ms. Hanlon, Ms. Mazzarello was confronted by Mr. Moore, who denigrated Ms. Mazzarello's physical appearance and threatened to remove her from the mentoring program in which she was participating. (Mazzarello depo, page 208, line 17 – page 209, line 21, page 211, line 15 – page 212, line 2).

Mr. Moore came to believe that Ms. Bryan and Ms. Mazzarello were primarily responsible for spreading rumors regarding his relationship with Ms. Hanlon, and stated so to various Lucent employees. (See Shapiro Affidavit; Hanlon depo, page 65, lines 8 – 19). Mr. Moore further advised employees to keep away from Plaintiff and Ms. Mazzarello, and began to refer to Plaintiff and Ms. Mazzarello as "troublemakers" and "poison" to Lucent. (Hanlon depo, page 64, lines 5 – 11; Shapiro Affidavit).

On or about February 10, 2001, Plaintiff met with Ms. Pam Worley. During the course of that meeting, Ms. Worley advised Plaintiff that she had been ordered by Tom Moore to reevaluate

Plaintiff's job performance. (Bryan depo, page 235, lines 10 – 13, page 256, lines 16- 19, page 286, line 17 – page 287, line 1). During the course of that meeting, Ms. Worley further referred to Lucent's Supplier Diversity Program as a "runaway train." (Id.) On February 13, 2001, Plaintiff met with Mr. Moore. During the course of that meeting, Mr. Moore told Plaintiff that Mr. Don Ames, who was at that time a C-Level manager in Lucent's sales realization division, had rated Plaintiff poorly, and felt that Plaintiff was not properly handling the supplier diversity program. (Moore depo, page 164, line 19 – page 165, line 6; Bryan depo, page 287, lines 1 – 15). Mr. Moore further advised that as a result of this poor rating and the perception that Plaintiff was not properly handling the supplier diversity program, Mr. Moore was going to remove Plaintiff from her compensation plan. (Id.) 12 Mr. Moore was aware from prior conversations that Plaintiff had received some form of a compensation plan throughout her career, and that she considered her compensation to be an important aspect of her job. (Bryan depo, page 230, lines 12-14; Moore depo, page 132, line 20 – 133, line 2).

Plaintiff was aware of other situations in which Lucent employees, namely an employee named Pat Gilbert, had been removed from a compensation plan by Tom Moore, and was subsequently laid off from employment with Lucent. (Bryan depo, page 290, line 6 – page 6; Shapiro Affidavit; Zachmann depo, page 61, line 14 – page 62, line 11; McFaul depo, page 203, line 17 – page 204, line 17; Affidavit of Patricia Gilbert, attached hereto as Exhibit 21). As a result, Plaintiff believed that her job was in jeopardy. (Bryan depo, page 229, line 16 – page 230, line 3).

---

12 This would have resulted in Plaintiff's income being reduced from approximately $200,000.00, of which approximately $67,000.00 represented a base salary, with the rest representing compensation and bonuses, to a base salary of $67,000.00, a loss of approximately $ 133,000.00 annually. (Bryan depo, page 72, line 17 – page 75, line 9,

PDFMAILER.com   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

After Mr. Moore advised Plaintiff that he was going to remove Plaintiff from her compensation plan, Plaintiff immediately requested a transfer to another position within Lucent where the Sales Manager, Eric Hofstetter, had indicated that a position would be available for Plaintiff.  (Bryan depo, page 302, lines 2 – 10, page 324, line 16 – page 325, line 8).  Mr. Moore told Plaintiff at that time that she could not transfer to the proposed position because he was promoting Mr. Herr to be the supervisor of that group. (Bryan depo, page 230, lines 11 – 17).

After the February 13, 2001 meeting with Mr. Moore, Plaintiff contacted Mr. Don Ames to verify his purported statements related to Plaintiff's alleged non-performance.  Mr. Ames denied that he had spoken negatively about Plaintiff or her job performance, as Mr. Moore had indicated.  (Bryan depo, page 428, line 13 – page 429, line 14; McFaul depo, page 172, lines 14-17).

After Plaintiff's meeting with Mr. Moore, Plaintiff was informed by Ms. Worley that she was not permitted to meet with her customers.  (Bryan Affidavit).  Plaintiff thereafter began to look for a position within Lucent to which she would be able to transfer.  However, Plaintiff found difficulty in securing a transfer, as supervisors who had previously indicated that they had positions available now told Plaintiff that there were none.  (Bryan depo, page 301, line 11 – page 302, line 10).

On or about February 23, 2001, Ms. Worley issued an e-mail that purported to list the members of her team.  Tellingly, Ms. Bryan's name was not included as being a member of that team.  (See 2/23/01 e-mail from Pam Worley, attached hereto as Exhibit 22).  Towards the end of March, Ms. Bryan spoke with Mr. Ames, at which time Plaintiff and Mr. Ames discussed-that

---

page 232, lines 2 – 9).

20

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

Plaintiff may be retaliated against for her reporting of Mr. Herr.  Mr. Ames responded that he did

not know what was going on.  (Bryan depo, page 428, lines 6-14).  However, Mr. Ames did

advise Plaintiff that he believed that Ms. Worley and Mr. Moore were trying to "get something"

on Plaintiff in order to allege insubordination.  Mr. Ames cited as an example an occasion when

Ms. Worley called Mr. Ames to verify that Ms. Bryan had attended a meeting with him on March

16, 2001.  (Bryan Affidavit).  Mr. Ames further stated to Plaintiff a belief at that time that Mr.

Moore and Mr. Herr were friends.   (Bryan depo, page 430 lines 4-7; See also Shapiro Affidavit).

**F.     Plaintiff's Attempts to Seek Help from Human Resources Were Ignored.**

Based upon the above occurrences between Plaintiff, Ms. Mazzarello, Mr. Moore, and

Ms. Worley, Plaintiff began to speak with members of Lucent's human resources department

regarding her concerns.   In early March of 2001, Ms. Bryan contacted Laraine Scarpon, a human

resources manager on Lucent's Verizon customer team, regarding her discomfort with the

relationship between Mr. Moore and Ms. Hanlon.  (Bryan depo, page 298, line 18 - page 299, line

1).  Ms. Scarpon advised Plaintiff that she had received complaints from numerous employees

regarding Mr. Moore's conduct with Ms. Hanlon, specifically allegations that Mr. Moore and Ms.

Hanlon would go out for drinks, that Ms. Hanlon would sit on Mr. Moore's lap and that their

behavior in general was inappropriate.  (Scarpon depo, page 46, lines 1-12, page 47, lines 1-19).

13  Plaintiff further informed Ms. Scarpon that Mr. Moore had ordered Ms. Worley to

investigate Plaintiff's job performance, that Ms. Worley was checking up on Plaintiff as to

meetings that Plaintiff attended, that Ms. Worley had issued the February 23, 2001 e-mail

_____

13 According to Ms. Scarpon, she brought the various complaints of other employees regarding Mr. Moore's conduct
with Ms. Hanlon to her supervisor, Mr. Ed May.  (Scarpon depo page 47, lines 10- 19).

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

excluding Plaintiff from the list of Ms. Worley's team members, that Mr. Moore had said he was taking Plaintiff off of her compensation plan because of performance issues, and that Plaintiff had become increasingly uncomfortable with the relationship between Ms. Hanlon and Tom Moore. Plaintiff further informed Ms. Scarpon that Mr. Moore was trying to finalize Plaintiff's transfer before March 14, 2001 so that she would not receive her compensation for the month of March. (Bryan Affidavit; Scarpon depo, page 51, line 20 – page 52, line 18; page 56, line 8 – page 57, line 1; page 57, line 12 – page 58, line 7).

Based upon the above, Plaintiff related to Ms. Scarpon that Ms. Bryan believed that she was being retaliated against for having complained about Mr. Herr's conduct toward Plaintiff. (Bryan Affidavit). Ms. Scarpon advised Plaintiff that there was no record of those incidents and further stated that the issue of Mr. Herr's conduct had been "swept under the carpet." (Bryan Affidavit). Ms. Scarpon did not forward Ms. Bryan's complaints to her supervisor, Mr. Ed May. (Scarpon depo, page 70, lines 12 – 17).

Plaintiff further contacted Ms. Gerry Auer of Lucent's Corporate Human Resources Department to report the above conduct of Mr. Moore and Ms. Worley. Ms. Auer responded in an abrupt manner with Plaintiff, and stated that she was too busy taking care of employees who just lost their jobs to speak with Plaintiff. However, Plaintiff insisted that Ms. Auer accept documentation of the incidents that had occurred over the previous 2½ years to include the Chris Herr sexual harassment as well as Mr. Moore and Ms. Worley's retaliation against Plaintiff. Ms. Auer reluctantly agreed to accept a statement of facts, so long as the statement did not contain any accusations against Mr. Herr, Mr. Moore, or Ms. Worley. (See Memo Lisa Bryan to Gerry Auer, dated 3/12/01, attached hereto as Exhibit 23; Bryan Affidavit). On March 12, 2001,

22

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

Plaintiff sent an outline detailing the facts behind her concerns to Ms. Auer, and requested that Ms. Auer keep her complaint confidential, out of fear of further retaliation by Mr. Moore and Lucent. 14  Despite Plaintiff's complaints, Defendant took no action to correct the problems.

Plaintiff, as well as Ms. Mazzarello, also spoke with Mr. Richard McFaul and conveyed concerns that they both had related concerns of potential retaliation as a result of their complaining about Mr. Herr.  (McFaul depo page 156, line 7-14).  Mr. McFaul attempted to speak with Pam Worley regarding Plaintiff's and Ms. Mazzarello concerns regarding her conduct toward them, but was told to mind his own business.  (McFaul depo, page 189, line 6 – 19).  Mr. McFaul also communicated with Mr. Moore regarding Plaintiff and Ms. Mazzarello's concerns. Mr. McFaul outlined a history of events related to Plaintiff and Ms. Mazzarello that Mr. McFaul characterized as sexual harassment, and further outlined negative events that occurred to Plaintiff and Ms. Mazzarello after they had complained about the harassing conduct.  With this history, Mr. McFaul expressed a concern to Mr. Moore that his conduct toward Plaintiff and Ms. Mazzarello could appear to be retaliation for their reporting of Mr. Herr.  Mr. Moore denied retaliating against Plaintiff and Ms. Mazzarello, and Mr. McFaul did not speak further to Mr. Moore or escalate his concerns for retaliation against Plaintiff to any other manager at Lucent thereafter.  (McFaul depo, page 198, line 7 – page 200, line 5).

Ms. Bryan conversed regularly with Ms. Linda Zachmann, who was employed at the time as Vice President Spurrier's Executive Assistant, regarding her discomfort with Mr. Moore's relationship with Ms. Hanlon in the office.  (Zachmann depo page 42, lines 8 – 16). During her conversations with Plaintiff, Ms. Zachmann related to Plaintiff that she too was uncomfortable

---

14 Despite Plaintiff's request to keep her Complaint confidential, Ms. Auer faxed a copy of Plaintiff's outline to Mr.

PDFMAILER.de   Produce PDFs for free with commercial use. Sponsored by: www.pdfmailer.de

with Mr. Moore's conduct in the office, and cited a specific incident in which Ms. Hanlon accompanied Mr. Moore on an extremely confidential business trip, despite the fact that he was advised that there would be administrative staff provided at the meeting.  (Bryan Affidavit.)  Ms. Zachmann informed Vice President Spurrier of Mr. Moore's relationship with Ms. Hanlon. (Zachmann depo, page 38 lines 10-17).

**G.  Plaintiff's Transfer and Ultimate Resignation**

After searching for a position within Lucent's Verizon Customer Team without success, Plaintiff finally discovered an open position on Lucent's Government Team, which was supervised by Mr. James Orefice, Sr.  (Bryan depo, page 300, line 21 – page 304, line 14).  After Plaintiff interviewed with Mr. Orefice and Mr. Patrick Loprete, the C-Level manager on the government team, Plaintiff informed Mr. Moore of her intent to transfer.  When Plaintiff did so, Mr. Moore pulled Plaintiff into an office and derided the government team, stating that the government team was "made up of losers."  (Bryan depo, page 320, line 5 – page 321, line 11).  Their discussion eventually moved to the subject of Mr. Herr.  Mr. Moore informed Plaintiff that he had absolved Mr. Herr of any wrongdoing in reference to his conduct toward Plaintiff and Ms. Mazzarello. (Bryan depo, page 322, line 7 – page 323, line 17).  Mr. Moore further reminded Plaintiff that there was no compensation plan in the government team position, to which Plaintiff retorted that she was being removed from her compensation plan on the Verizon Customer Team (Id.) Mr. Moore acknowledged that he was planning to remove Plaintiff from her compensation and became angry, stating "How does it feel to have someone ruin your career without doing anything wrong?"  (Bryan depo, page 423, line 2 – page 425, line 4).  Throughout the period of time in

_____

Moore on or about March 14, 2001, two days after receiving the outline from Plaintiff. (Bryan Affidavit).

PDFMAILER... ...sored ...mailer...

which Plaintiff sought a transfer away from Mr. Moore's supervision, Mr. Moore continued to

speak disparagingly about Ms. Bryan, referring to Plaintiff as a "troublemaker" and "poison" to

Lucent. (Shapiro Affidavit).

On the evening of March 5, 2001, Mr. Moore called Plaintiff at home, despite Plaintiff's

request that Mr. Moore not do so, in order to discuss a meeting that Plaintiff had walked out of

after becoming upset as a result of the office environment and her job status at the time, as well as

comments that Mr. Moore had allegedly made to Ms. Kelly Hanlon, stating that Plaintiff was "not

doing what she was supposed to be doing." (Bryan depo, page 389, lines 2-3, page 416, line 13 –

page 417, line 5; Moore depo, page 231 lines 3-21 Page 232 lines 1-5). Plaintiff also discussed

with Mr. Moore his plan to remove Plaintiff from her compensation plan, as well as her problems

with Mr. Herr and Ms. Worley. (Bryan depo, page 418, lines 8-13). Plaintiff stated to Mr.

Moore that she felt she was being retaliated against and told Mr. Moore that she felt that her

whole world at Lucent was falling apart. (Bryan depo, page 419, line 12 - page 420, line 5).

Following the March 5, 2003 meeting, Mr. Moore contacted Ms. Zollie Perry of Lucent's Human

Resources department, and alleged that that Plaintiff's mental state had become unpredictable,

and that Plaintiff may pose a danger to Pamela Worley. (Moore depo, page 235, line 9 – page

236, line 14). 15 Such a report would have been included in Plaintiff's personnel file for future

managers to review.

On March 7, 2001, Mr. Moore sent Plaintiff an e-mail in which Mr. Moore advised

that he was planning to have Plaintiff's transfer take effect between March 10, 2001 and March

---

15 Ms. Worley testified that while Plaintiff was on the Verizon Customer Team, Ms. Worley was not aware of any
questions or concerns that were raised regarding Ms. Bryan's emotional stability or that Plaintiff posed a potential
physical threat. (Deposition of Pam Worley, attached hereto as Exhibit 24, page 154, line 21 - page 152, line 1-5).

PDFMAILER.com Print and send PDF files as E-mails with any application, ad-sponsored and free of charge www.pdfmailer.com

15, 2001. (E-mail from Tom Moore to Lisa Bryan, 3/7/01, attached hereto as Exhibit 25; Bryan Affidavit). After Complainant received this e-mail from Tom Moore, she contacted Ms. Laraine Scarpon, Verizon Customer Team Human Resources Manager, regarding the e-mail. Ms. Scarpon further advised Plaintiff that she had spoken with Eileen Nolan, who was at that time employed by Lucent with responsibility for personnel compensation packages. According to Ms. Scarpon, Ms. Nolan advised that if Plaintiff were to be transferred or otherwise taken off of her compensation plan before March 15, 2001, Plaintiff would not be entitled to receive compensation for that month. (Bryan Affidavit). Ms. Scarpon further advised Plaintiff that if she were transferred between March 15, 2001 and March 31, 2001, Plaintiff would receive her monthly compensation solely at the discretion of the Verizon Customer Team. (Bryan Affidavit). The loss of compensation for the month would have represented a loss of $9,720.00 to Plaintiff. (Bryan Affidavit). Mr. Moore, as a D-Level manager, was aware of the effect that an early transfer would have on Plaintiff's ability to receive compensation. (Scarpon depo, page 70, lines 1 – 6).

Plaintiff transferred to the government team on or about April 1, 2001. (Bryan depo, page 253, lines 3 – 5). On April 14, 2001, Plaintiff met with Mr. Moore for the purpose of completing her transition from her position on the supplier diversity program. During the course of that meeting, Mr. Moore stated that he could have Plaintiff brought back to the Verizon Customer Team at any time, and that Plaintiff was not "safe" merely by transferring to Lucent's government team. (Bryan depo, page 331, line 17 – page 333, line 5). After Plaintiff had this discussion with Mr. Moore, Plaintiff spoke with her new supervisor, Patrick Loprete about whether Mr. Moore could effectuate her transfer back to the Verizon customer team. (Deposition of Patrick Loprete, attached hereto as Exhibit 26, page 63, lines 11 – 20). Plaintiff also spoke

26

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

with Ms. Scarpon regarding Mr. Moore's statement that he could cause Plaintiff to be transferred back under his supervision. Both Mr. Loprete and Ms. Scarpon advised Ms. Bryan that it was possible for Mr. Moore to cause a transfer back under his supervision, due to the relationship Mr. Moore had with Vice President Carole Spurrier, who was at the time the Sales Vice President for Lucent's North American East Division and a supervisor of both Mr. Moore and Mr. Orefice, Sr. Prior to becoming Plaintiff's D-Level supervisor, Mr. Moore had been Ms. Spurrier's Executive Assistant.  (Bryan Affidavit; Moore depo, page 9, lines 9 – 19; Loprete depo, page 65, line 6 – page 67, line 11).  Based upon this information, Plaintiff reasonably believed that Mr. Moore could effectuate a transfer back to the Verizon Customer Team, because Mr. Moore was a D-Level manager, as well as a former Executive Assistant to Carole Spurrier, (Bryan Affidavit)

In April of 2001, Mr. Loprete required Plaintiff to meet with Mr. Dennis Ward, who had responsibility for the sales realization center over at Linthicum for Lucent, where Tom Moore, Pam Worley and Chris Herr worked. (Loprete depo, page 73, line 13 - page 74, line 12; 4/30/01 Email from Patrick Loprete to Lisa Bryan, attached hereto as Exhibit 27).  Plaintiff was very upset that she might have a chance encounter with Mr. Moore, Ms. Worley or Mr. Herr, so much so that she became physically ill at the thought of it.  (Bryan depo, page 356 lines 12-13).

Plaintiff further failed to receive compensation pursuant to a transition plan that was enacted to soften the financial impact of Plaintiff's transfer to the government team.  (Bryan depo, page 306, line 16 – page 307, line 3; Pay stub dated April 30, 2001, attached hereto as Exhibit 28).16  Based upon Mr. Moore's threat and apparent authority to effectuate a transfer back under

---

16 Defendant makes an issue in its Motion for Summary Judgment as to Mr. Moore's purported efforts to secure a transition compensation plan package for Plaintiff upon her transfer to the government team.  The fact remains that Plaintiff did not receive pay based upon a transition compensation package following her transfer.

his supervision, and the withholding of funds, Plaintiff somberly and reluctantly submitted a letter

of resignation to Mr. Loprete on or about May 11, 2001. (Loprete page 40, line 18 - page 41, line

1).

Mr. Loprete convinced Plaintiff to delay submitting her resignation until he had an

opportunity to determine whether there were any other positions within Lucent to which Plaintiff

could transfer. (Loprete depo, page 43, line 6 – page 44, line 10).  Mr. Loprete did in fact speak

with Ms. Patty Espy-English, who was Lucent's financial business manager, who initiated a

discussion with Mr. Loprete and Mr. Moore.  (Loprete depo, page 45, lines 14 – 19; page 49,

lines 7 – 10).  Mr. Moore was involved in the discussion as to available positions for transfer of

Plaintiff despite the fact that Mr. Loprete was aware that it was Mr. Moore that Plaintiff had been

transferring away from, in light of her previous history with Mr. Moore.  (Loprete depo, page 70,

lines 17 - 20).  During this conversation, Mr. Moore's tone during this meeting was "negative" in

tone in reference to Plaintiff. (Loprete depo, page 52, line 1 - page 53, line 10).  Ultimately, Mr.

Loprete did not come to a resolution as to whether there were any job openings for Plaintiff to

transfer into. (Loprete depo, page 45 lines 3-8).

Shortly after Plaintiff attempted to submit her resignation on May 11, 2001, Ms.

Mazzarello advised her that Mr. Moore had spoken negatively about Plaintiff at the Verizon

Customer Team Picnic on that date.  Mr. Moore stated that Plaintiff was bad for the organization,

that Mr. Moore would never rehire Plaintiff, and that he was glad to hear that Plaintiff was

resigning.  (Bryan depo, page 335, line 7 – page 339, line 12; Mazzarello Affidavit; Dugan depo,

page 100, line 14 - page 101, line 10). 17  After learning of Mr. Moore's statements, Plaintiff

_____

17 Plaintiff testified at deposition that it was Dawn Dugan who had advised Ms. Mazzarello of Mr. Moore's comments.

28

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

became very upset, and contacted Mr. Loprete at his home. During the course of her conversation with Mr. Loprete, Plaintiff informed him of her history of conflict with Mr. Herr and Mr. Moore. (Loprete depo, page 53, line 7 – page 54, line 5; Bryan Affidavit).

Plaintiff officially submitted her resignation on Monday, May 14th, 2001, and her last day with Lucent was May 23, 2001. (Bryan depo, page 340, lines 9 – 11; Bryan Affidavit). After submitting her resignation, Plaintiff shared with Ms. Zachmann, Vice President Carole Spurrier's Executive Secretary, that she was resigning because she was being discriminated against and that her health was consequently suffering. (Zachmann depo, page 58, lines 13-18). On May 23, 2001, Ms. Bryan submitted an updated statement of events to Ms. Auer, which included additional statements regarding the conduct of Mr. Herr and Mr. Moore. (Statement of Events 5/23/01, attached hereto as Exhibit 29). Again, there was no investigation into Plaintiff's Complaints.

During the period of time after Mr. Moore had informed Plaintiff that she was going to be removed from her compensation plan and her pay was going to be significantly reduced, Plaintiff had begun to believe that her job was in jeopardy, and that she might be terminated or otherwise placed in a situation position where she would not have a job. As a result, Plaintiff began to look into the possibility of other employment outside of Lucent. Through Plaintiff's inquiries, Plaintiff had received an offer of employment with Signal Corporation to join Signal as a Commercial Sales Vice President. (Bryan depo, page 342, line 12 – page 343, line 12). That offer was revised on or about May 2, 2003. (Bryan depo, page 346, lines 6 – 21). Plaintiff accepted Signal's revised offer and began work for Signal on or about June 1, 2001. (Bryan

---

(Id.) At her deposition, Ms. Dugan testified that Mr. Moore had made a negative comment about Plaintiff, but did not

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

depo, page 358, line 19 – page 359, line 5).  The job Plaintiff took at Signal was *not* more responsibility or money than Plaintiff made while working on the Verizon Customer Team at Lucent Technologies. (Bryan depo, page 351, lines 20 - page 352, line 1; page 354, lines 5 - page 355, line 20).  Rather, Plaintiff expected to earn $240,000.00 annually with Signal, which was approximately what Plaintiff earned on Lucent's Verizon customer team in 2000.  (Bryan depo, page 351, lines 3 – 6).  Moreover, while Plaintiff was to assume control of a newly created team with Signal, Plaintiff's new position did not entail greater responsibility than she had known with Lucent, as Plaintiff had previously had management responsibilities within Lucent, and had previously developed teams within Lucent's predecessor organizations.  (Bryan depo, page 354, line 5 – page 355, line 6).

Within days of Plaintiff's departure, Lucent announced a "5 and 5 early retirement plan," for which Plaintiff would have qualified had she remained at Lucent.  (Bryan depo, page 356, line 20 – page 337, line 8).  Had Plaintiff still been employed at Lucent at the time that the retirement plan was introduced, Plaintiff most likely would have enrolled in the plan and taken early retirement.  (Bryan depo, page 357, lines 5 – 21).  Plaintiff inquired as to whether she would be able to return to Lucent as an employee to participate in the "5 and 5" plan.  (Scarpon depo, page 76, lines 5 – 10) and was advised to write a letter to Pamela Kimmet, Vice President of Human Resources for Lucent Technologies.  (Bryan Affidavit).

Plaintiff wrote to Lucent stating that she had been forced to leave the Verizon Customer Team and ultimately Lucent Technologies, and identified those individuals within Lucent who had knowledge as to why Plaintiff resigned.  (Letter from Lisa Bryan to Pamela Kimmet dated June

---

recall the substance of that comment.  (Dugan depo, page 110, line 14 – page 101, line 10).

PDFMAILER.COM    Print and send PDF files as Emails with any application, ad-sponsored and free of charge    www.pdfmailer.com

18, 2001, attached hereto as Exhibit 30). Despite Plaintiff's attempts, Plaintiff was not permitted to rejoin Lucent and participate in the "5 and 5" plan. (Scarpon depo, page76, lines 5 – 10). This was contrary to other situations in which Lucent accommodated employees that resigned from Lucent. Mr. Eric Hofstetter, a male C-Level manager within Lucent, requested to be laid off after being demoted by Lucent. (Deposition of Eric Hofstetter, attached hereto as Exhibit 31, page 24, line 19 – page 25, line 1; page 26, lines 1 - 19). By being laid off, Mr. Eric Hofstetter was eligible to receive a severance package. (Hofstetter depo, page27, lines 7 – 19). Pursuant to his request, Mr. Hofstetter was laid off from Lucent on January 16, 2003. (Hofstetter depo, page 28, lines 19-20). There were no other members of the Verizon Customer Team laid off at the same time as Mr. Hofstetter. (Hofstetter depo, page 37 line 18 -page 38 line 2).

In addition to Mr. Hofstetter, Ms. Joyce Hart, an employee on Lucent's AT&T Customer Team, requested a severance package in March 2001, rather than resign. Ms. Hart further requested a 30-day extension of her termination date so that Ms. Hart could qualify for her pension plan. Lucent negotiated with Ms. Hart, and as a result, her termination date was extended from May 2001 to July 2001, and Ms. Hart was able to receive retirement. (Bryan Affidavit). Furthermore, Plaintiff learned from Ms. Audrey Davis, who at the time was an employee of Century Technologies, a minority-owned business enterprise with whom Plaintiff had dealings as the supplier diversity manager, of another individual who was permitted to participate in the "5 and 5" plan after having already resigned from Lucent. Ms. Davis advised Plaintiff that she had learned from Mr. Tommy Gould, a former Lucent employee, that he knew of a man based in Lucent's Hunt Valley office that had retired and was on vacation when he heard of the 5 and 5 plan. This gentleman was allegedly allowed to come back to work to take advantage of the 5 and

31

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

5 plan. (Bryan Affidavit; Deposition of Audrey Davis, attached hereto as Exhibit 32, page 16, lines 7 – 13).

## IV. ARGUMENT

### A. Plaintiff's Claims Are Timely.

A person alleging unlawful employment practices as described must timely file a charge before the Equal Employment Opportunity Commission within 300 days of the alleged unlawful practice. 42 U.S.C. §2000e-5(e)(1). Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire constitute separate unlawful employment practices which must occur within the 300-day time frame in order to be actionable. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). However, a charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice, and at least one act falls within the time period. *Id.*, 536 U.S. at 122.

Defendant asserts that Plaintiff's remaining allegations must fall because they occurred more than 300 days prior to Plaintiff's initial filing. Plaintiff, however, does not complain of separate discrete acts, but rather a pattern of discriminatory and retaliatory acts. Such allegations are not time barred so long as all acts which constitute the claim are part of the same unlawful employment practice, and at least one act falls within the time period. *National Railroad,* supra, at 122. In this case, Plaintiff initiated proceedings with the EEOC on or about December 14, 2001. As a result, Plaintiff must allege a discrete adverse action that occurred on or after February 17, 2001. Defendant asserts in its Motion for Summary Judgment that no adverse action occurred after February 17, 2001. Actually, Plaintiff asserts two such events that

PDFMAILER... produced and printed with PDFMailer... censored and emailer...

constitute an adverse action against her: Plaintiff's forced transfer to Lucent's government team on April 1, 2001, and Plaintiff's ultimate forced resignation from Lucent, which was officially submitted on May 14, 2001, with Plaintiff's last day on May 23, 2001.

Employer conduct amounts to an adverse employment action if it constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a change causing a significant change in benefits. *Nichols v. Comcast Cablevision of Maryland*, 84 F. Supp. 2d 642, 654 (D. Md. 2000)(citations omitted). In the instant matter, Ms. Worley told Plaintiff on February 10, 2001 she had been ordered by Mr. Moore to investigate Plaintiff's work. Between February and March of 2001, Ms. Worley contacted other managers in order to check up on Plaintiff. On February 13, 2001, Mr. Moore threatened to remove Plaintiff from her compensation plan, which would have resulted in a 75% reduction in plaintiff's pay. Plaintiff was at that time aware of occasions in which Lucent employees had been removed from compensation plans by Tom Moore, and laid off soon thereafter. 23, 2001, Ms. Worley issued an e-mail purporting to detail the members of her team, but excluded Plaintiff's name as a member of her team. These events occurred after a series of incidents between Plaintiff and Ms. Worley, after Mr. Moore had accused Plaintiff of not properly managing the supplier diversity program, after Plaintiff had complained regarding Mr. Moore's conduct with Ms. Hanlon and during a period of time in which Mr. Moore was referring to Plaintiff as a "troublemaker" and "poison" to Lucent. Based upon all of these events and facts, Plaintiff was forced to conclude that her position was in jeopardy, compelling her to seek a transfer away from Mr. Moore in order to avoid a potential layoff by his hands.

After an exhaustive search in late February of 2001, Plaintiff finally found an open position

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

on Lucent's government team.  However, that position did not have a compensation plan, meaning that Plaintiff faced a reduction of pay to a base salary.  Plaintiff requested to be placed on a transition plan to offset the financial impact that Plaintiff expected to incur as a result of the transfer.  (Bryan depo, page 309, lines 6 – 14). Although Plaintiff was advised at that time that she would receive a transitional compensation plan, and despite Defendant's assertions as to the efforts expended by Mr. Moore in finalizing Plaintiff's transition plan, the fact remains that Plaintiff was not compensated pursuant to a compensation plan following her transfer.  (Bryan depo, page 306, line 16 – page 307, line 3; Exhibit 28).  Once Ms. Bryan.  During the transition phase, Mr. Moore went so far as to allege that Plaintiff was mentally unstable to Lucent's human resources department, an allegation that would have been included in Plaintiff's personnel file for other managers to review.

Plaintiff further alleges that after her transfer from the Verizon Customer Team, Mr. Moore continued to threaten Plaintiff with the possibility of having her transferred back to the Verizon customer team.  Plaintiff had good reason to believe that Mr. Moore had the ability to effectuate such a transfer, and that his threat was therefore credible.  Mr. Moore was a D-Level supervisor, and moreover was the former Executive Assistant to Vice President Carole Spurrier, who was also the overall director of Lucent's government team, to where Plaintiff had transferred.  Mr. Loprete, Plaintiff's immediate supervisor on the government team, confirmed Plaintiff's fear that Mr. Moore could have Plaintiff transferred back under his supervision. Given the history between Plaintiff and Mr. Moore, the prospect of being forced to return to Mr. Moore's supervision caused her to submit her resignation to Mr. Loprete.  Mr. Loprete requested that Plaintiff delay the submission of her resignation until he could determine whether there was

34

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

anywhere else to which Plaintiff could transfer.  Rather than truly investigate available positions for Plaintiff, Mr. Loprete went to Ms. Espy-English, who went to Mr. Moore, the source of Plaintiff's problems with Lucent.  Mr. Loprete, who was aware of the prior relationship with Mr. Moore and Plaintiff, made no further attempt to search for an alternate position for Plaintiff. Meanwhile, Mr. Moore continued to denigrate Plaintiff as a "troublemaker" and "poison" to Lucent and stated "negatively" to other Lucent employees that Plaintiff was a poor employee, and that he would not rehire her, given the opportunity.  Given the above, Plaintiff found her employment situation to be intolerable, causing Plaintiff to ultimately resign her employment with Lucent.

As the stated transfer and subsequent resignation of Plaintiff occurred within the statutory period, Plaintiff's remaining allegations are not time barred, insofar as the stated transfer and resignation/constructive discharge constitutes one instance in the line of discriminatory and retaliatory acts that occurred.  *National Railroad,* supra, at 122.

## B. Plaintiff's Sexual Harassment Allegations are Actionable.

To establish a *prima facie* case of hostile work environment based upon sex, an employee must show 1) that there was unwelcome harassment; 2) the harassment was based upon sex; 3) the harassment was sufficiently pervasive to alter the conditions of employment and create an abusive atmosphere; and 4) there is some basis for imposing liability.  *Orenge v. Veneman,* 218 F.Supp. 2d. 758, 766 (D. Md. 2002) citing *Spriggs v. Diamond Auto Glass*, 242 F. 3d 179, 183-84 (4th Cir. 2001.)  See also *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 266 (4th Cir. 2001.  The Plaintiff must not only show she subjectively felt the environment to be hostile, but also that it would have been objectively hostile to a reasonable person.  *Id.*, citing

35

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993).

In the instant matter, Defendant has previously conceded that, if true, the comments and actions of Mr. Herr prior to Plaintiff's removal from his supervision constituted inappropriate and offensive conduct.  (See, Defendant's Memorandum In Support of Defendant's Motion for Summary Judgment, p. 20, *Mazzarello v. Lucent*, Civil Action No. AMD 02 CV 3576.)  It is also undisputed that during the period of time between October of 1998 and August of 1999, Mr. Herr was Plaintiff's immediate supervisor, a position that would impute vicarious liability upon Defendant as a result of Mr. Herr's actions.  *Faragher*, 824 U.S. at 807-808.

After Plaintiff was removed from Mr. Herr's supervision in August of 1999, Plaintiff was required to have continued interaction with Mr. Herr on Y2K project matters, and was further required to meet with Mr. Herr for her year-end review in December of 1999, despite her alleging incidents of sexual harassment.  Plaintiff was further required to interact with Mr. Herr in her new role with Lucent's supplier diversity program, by the nature of Mr. Herr's position as a C-Level manager.  (McFaul depo, page 134, lines 1-4).  Additionally, Plaintiff was required to interact with Mr. Herr during normal sales meetings, client meetings, company picnics, executive meetings related to quarterly read-outs by executives, and in the normal course of working in the same office, on the same floor. (Bryan Affidavit).

In August of 2000, Tom Moore became Plaintiff's D-Level supervisor, and also participated in harassment toward Plaintiff, complaints about which were ignored. Mr. Moore engaged in a pattern of conduct in the office with Kelly Hanlon that had the effect of altering the terms and conditions of Plaintiff's employment, and of causing severe discomfort to Plaintiff, as well as to other Lucent employees.   Plaintiff complained about her discomfort with Mr. Moore's

36

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

conduct to the Verizon customer team's human resources department, to Lucent's corporate human resources department, to Ms. Zachmann, to Ms. Shapiro, and to Ms. Mazzarello as Ms. Hanlon's mentor.

Mr. Moore's comments to Plaintiff regarding his perception that Plaintiff was judged on the basis of her appearance had the further effect of causing Plaintiff to believe that she was not being viewed or evaluated for her job performance, but rather on her appearance as a woman. (Bryan depo, page 271, line 16 – page 273, line 6). Based upon the foregoing, and construing all facts and reasonable inferences in Plaintiff's favor, Plaintiff has established a *prima facie* case of sexual harassment.

## C. Plaintiff Has Established a *Prima Facie* Case of Gender Discrimination.

To establish a *prima facie* case of discrimination under the *McDonnell Douglas* analysis, a plaintiff employee must establish that 1) employee is a member of a protected class; 2) that she suffered an adverse employment action; 3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and 4) that the employee was treated differently from similarly situated employees. See *Brinkley v. Harbour Recreation Club*, 180 F.2d 598, 609 (4th Cir. 1999).

Defendant mistakenly asserts that Plaintiff has not established discriminatory or retaliatory intent or motive on the part of Lucent for its actions toward Plaintiff leading up to Plaintiff's transfer and subsequent resignation in or about May of 2001. To the contrary, the facts as alleged clearly demonstrate discriminatory and retaliatory intent on the part of Mr. Moore and, vicariously, Lucent**.**

As already discussed, Plaintiff suffered two instances of actionable adverse employment

PDFMAILER.COM Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

action, in Plaintiff's transfer to Lucent's government team, and in Plaintiff's subsequent constructive discharge. The facts as alleged clearly demonstrate discriminatory and retaliatory intent on the part of Mr. Moore and, vicariously, Lucent. As proven, Mr. Moore made statements to Plaintiff about how she and Ms. Mazzarello had been evaluated on the basis of their appearance, rather than their performance. Mr. Moore further dismissed the conduct of Mr. Herr toward Plaintiff, absolving Mr. Herr of any wrongdoing and stating that "boys will be boys" in relation to Mr. Herr's conduct.

Mr. Moore came to believe that Plaintiff was one of the individuals primarily responsible for his relationship with Ms. Hanlon becoming an issue within the office. Shortly after Ms. Mazzarello spoke with Ms. Hanlon and Mr. Moore regarding complaints received with regard to their conduct, Mr. Moore advised Plaintiff that he intended to remove Plaintiff from her compensation plan. Throughout the course of Plaintiff's employment with Lucent, Plaintiff received favorable performance reviews, and was considered to be a good employee. However, after Plaintiff complained about Mr. Moore's conduct, Mr. Moore misrepresented to Plaintiff that other Lucent managers had rated Plaintiff poorly due to problems with Plaintiff's handling of Lucent's supplier diversity program. Mr. Moore used this misrepresentation as the alleged reason behind his stated Plaintiff to cause Plaintiff of his intent to remove Plaintiff from her compensation plan. It was also after Mr. Moore became aware of the complaints regarding his conduct with Ms. Hanlon that Plaintiff was told that she could not meet with her customers, and Plaintiff was excluded from Pam Worley's listing of her team members.

Mr. Moore's own statement to Plaintiff, "How does it feel to have someone ruin your career without doing anything wrong?" after Plaintiff accused Mr. Moore of retaliation is strong

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

evidence of retaliatory intent on the part of Mr. Moore.  No male employees were similarly treated after complaining about Mr. Moore's conduct with and toward Ms. Hanlon.  (Bryan Affidavit.)

### D.  Constructive Discharge

A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.  A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985)(citations omitted.)  Deliberateness exists if the actions complained of were intended by the employer as an effort to force the employee to quit.  Intent may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions.  Intolerability of working conditions, as is uniformly recognized, is assessed by the objective person standard of whether a reasonable person in the employee's position would have felt compelled to resign. *Id.* (citations omitted.)

The analysis for constructive discharge also applies in situations in which a party is forced to transfer from a position as a result of the employer's misconduct.  See *White v. Dial Corp.*, 882 F. Supp. 701, 704-705 (N.D. Ill. 1994).  Factors that may be considered in determining whether a transfer was a constructive involuntary transfer includes whether the employee suffered monetarily in light of what the employee would have earned in the former position, and whether the job to which the employee was transferring was of less stature or challenge.  Id.  Here, the evidence shows that Plaintiff was constructively and involuntarily discharged from her position.

Plaintiff incorporates the argument contained in Section A, supra, as it pertains to adverse

PDFMAILER.com  Print and send PDF files as Emails with any application, ad-sponsored and free of charge  www.pdfmailer.com

employment action, and the argument contained in Section C, <u>supra</u>, as it relates to discriminatory or retaliatory motive.  Plaintiff has also alleged that the conduct of Mr. Moore and Mr. Herr, and the resulting conditions of her employment became so intolerable as to force Plaintiff to transfer from her position on the Verizon customer team, and ultimately to resign from Lucent, creating a constructive discharge from her position.

 Mr. Moore had stated that Plaintiff was being evaluated on the basis of her appearance. Mr. Moore ordered Ms. Worley to reevaluate Plaintiff's job performance, and threatened to remove Plaintiff from her compensation plan, an action that would have resulted in a substantial loss of income to Plaintiff.  Plaintiff was forbidden by her immediate supervisor from meeting with customers, and was not included on a listing of her immediate supervisor's team members.  Mr. Moore, knowing that Plaintiff had an earlier history of harassment at the hands of Mr. Herr, advised Plaintiff that he had absolved Mr. Herr, that he was planning to promote Mr. Herr, and dismissed Mr. Herr's conduct by saying, "boys will be boys."  Mr. Moore disparaged Plaintiff in front of other Lucent employees.  Finally, Mr. Moore asked Plaintiff before she transferred away from his supervision, "How does it feel to have someone ruin your career without doing anything wrong?"  Mr. Moore's conduct forced Plaintiff to seek a transfer away from his supervision, resulting in Plaintiff accepting a position on Lucent's government team, where she faced a substantial reduction in pay to her base salary of $67,000.00 annually, after having spent her career on various forms of compensation plans in addition to her base salary.  Moreover, Plaintiff was forced to transfer to a newly created government focused team for which Plaintiff was to participate in marketing, rather than in the commercial sector, where Plaintiff had extensive experience.  (Bryan depo, page 304, line 6 – page 305, line 10).  Based upon the above, there is

PDFMAILER.com   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

sufficient evidence to establish that Mr. Moore had the specific intent to cause Plaintiff to transfer or to resign.

Plaintiff must also establish that the working conditions were intolerable in such a manner that a reasonable person in Plaintiff's position would have felt compelled to resign. *Bristow,* supra. Throughout her period of employment, Plaintiff was subjected to unwelcome comments and conduct by Mr. Herr and by Mr. Moore. Mr. Moore further created an atmosphere in which Plaintiff was made to feel uncomfortable with the conduct of Mr. Moore and Ms. Hanlon in the office. After complaining to Ms. Mazzarello and to human resources officials, Plaintiff was forced to operate under the threat of losing a substantial amount of income by the removal of her compensation, and with the knowledge that Mr. Moore had a stated intent to ruin Plaintiff's career. Mr. Moore went so far as to contact that Plaintiff was mentally unstable to Lucent's human resources department, an allegation that would have been included in Plaintiff's personnel file for future managers to review.

Plaintiff repeatedly complained of the conduct of Mr. Moore, Ms. Worley, and Mr. Herr towards her. She also complained of Mr. Moore's conduct to Mr. McFaul, who thought that the allegations were serious enough to contact Mr. Moore with concerns that Mr. Moore's actions appeared to be retaliatory. Mr. McFaul failed, however, to pursue any investigation into Mr. Moore and Ms. Worley's conduct. Plaintiff further complained to Ms. Gerry Auer and Ms. Laraine Scarpon in reference to the conduct of Mr. Herr, Mr. Moore, and Ms. Worley. Despite these complaints, Lucent failed to investigate or take any action on Plaintiff's behalf to address her complaints. Ms. Auer demonstrated hostility toward Plaintiff for attempting to lodge a complaint, ultimately insisting that Plaintiff could only submit a factual outline of events. Finally,

41

PDFMAILER.com Print and send PDF files as Emails with any application, ad-sponsored and free of charge www.pdfmailer.com

Plaintiff complained about the conduct of Mr. Herr, Mr. Moore, and Ms. Worley to Mr. Loprete. Again, Mr. Loprete failed to investigate or take Plaintiff's complaints to anyone within Lucent. These facts demonstrate an objectively intolerable working environment, as to constitute a constructive discharge.

Here, instead of resigning at the outset, Plaintiff initially sought a transfer away from Mr. Moore, and accepted a position with different responsibilities, and with less opportunity to receive compensation for her efforts. However, even after transferring away from Mr. Moore, Mr. Moore threatened that he could have Plaintiff transferred back to his supervision if he wished. Mr. Moore had the apparent authority to do so, as a D-Level manager, and as the former Executive Assistant of Lucent Vice President Carole Spurrier, who was also in charge of Lucent's government team. Mr. Moore further continued to disparage Plaintiff to other Lucent employees, referring to her as a "troublemaker" and "poison" to Lucent and stating negatively that Plaintiff was a poor employee whom he would not rehire, given the opportunity.

As a result of the conduct of Mr. Moore, Mr. Herr, and Ms. Worley, as a result of the failure of officials within Lucent's Corporate Human Resources and Verizon Customer Team Human Resources Department to respond to Plaintiff's repeated complaints of harassment and discrimination, as a result of Mr. Moore's stated intent to ruin Plaintiff's career, and Plaintiff's threat to transfer Plaintiff back under his supervision, Plaintiff reasonably believed that the conditions of her employment had become intolerable. Moreover, Plaintiff's job environment was such that her complaints and attempts to seek relief from the above conduct fell on deaf ears, or certainly upon individuals who failed to act upon Plaintiff's complaints. As such, the working conditions faced by Plaintiff were such that Plaintiff was compelled to resign, and were such that a

PDFMAILER PDF wird auto... with PDFMAILER sponsored ... ...mailer.com

reasonable person in Plaintiff's position would have felt compelled to resign, as well.

Even after Plaintiff submitted a letter of resignation to Mr. Loprete on or about May 11, 2001, Mr. Loprete convinced Plaintiff to delay submitting her resignation until he had an opportunity to determine whether there were any other positions within Lucent to which Plaintiff could transfer, a request that Plaintiff consented to. However, Mr. Loprete's attempts to locate alternate employment within Lucent led to Mr. Moore becoming involved in the search process, despite the fact that it was Mr. Moore that Plaintiff was transferring away from, and despite Mr. Loprete's knowledge of Plaintiff's history with Mr. Moore. Mr. Moore spoke negatively of Plaintiff during this conversation, and Mr. Loprete ultimately failed to reach a conclusion as to whether there were any job openings for Plaintiff to transfer into. Even after Plaintiff's initial attempt to submit her resignation, Mr. Moore continued to disparage Plaintiff, stating that Plaintiff was bad for Lucent, that Mr. Moore would never rehire Plaintiff, and that he was glad to hear that Plaintiff was resigning. After learning of Mr. Moore's statements, Plaintiff became very upset, and contacted Mr. Loprete at his home. These comments proved to be more than Plaintiff could handle, and Plaintiff officially submitted her resignation on Monday, May 14th, 2001.

### E.  Defendant's Stated Reasons for Transferring Plaintiff Are Pretextual and Without Merit.

Defendant's claim of legitimate, non-discriminatory reasons for their "actions" is without merit. Defendant denies that Mr. Moore threatened to remove Plaintiff from her compensation plan, and denies Mr. Moore's subsequent threat to force Plaintiff's transfer back to the Verizon

43

PDFMAILER.com   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

customer team.  In essence Defendant has failed to articulate a "legitimate" reason for its actions

because it claims that the actions never occurred.  Lucent has failed to rebut Plaintiff's claims,

other than to deny that the conduct occurred, and there is nothing upon which plaintiff can

respond to on the basis that the stated reasons are pretextual other than to assert the conduct

itself.  See Langerman v. Thompson, 155 F. Supp.2d 490, 496 (D. Md. 2001); Chika v. Planning

Research Corp., 179 F.Supp.2d 575, 581 (D. Md. 2002).

Certainly, Plaintiff's job performance cannot explain Defendant's actions.  As of January

21, 2001, Plaintiff's projected goal for the fiscal year 2001 was to meet or exceed 15 percent of

sales volume attributed to minority-owned businesses.  (Bryan 2001 Goal Statement; Worley

depo, page 70, line 21 – page 76, line 21, page 78, lines 4 – 15).  Plaintiff did in fact exceed that

stated goal, and in due in part to her efforts, reached a level of 24%.  However, after January 12,

2001, Lucent's accounting rules and practices changed, due in part to a decrease of business.

(Worley depo, page 84, line 10 – page 85, line 14).  As a result of these changes, Lucent decided

to revise its outlook for the supplier diversity program to not exceed 15% sales volume to

minority-owned businesses.  (Worley depo, page 85, line 20 – page 86, line 2).  Regardless,

Plaintiff's goal as outlined by Lucent management was to meet or exceed a 15% sales volume,

and Plaintiff achieved her goal.  Furthermore, in the time after Lucent decided to limit its supplier

diversity percentage, Plaintiff attempted to assist Lucent, by preparing a presentation as to how to

reduce the sales volume attributable to minority-owned businesses.  (Bryan Presentation, attached

hereto as Exhibit 33; Moore depo, page 186, line 16 – page 187, line 21; Bryan depo, page 227,

lines 3 - 15).  Here, Plaintiff's performance was such that she exceeded the goals demanded of her

by Lucent, and was such that she attempted to redirect the supplier diversity program after

PDFMAILER.com   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

business and accounting factors caused Lucent to change its priorities. Defendant cannot now cite Plaintiff's positive job performance as a basis for punishing Plaintiff by the removal of her compensation plan. Instead, Defendant's claim of legitimate reasoning is rebutted by Defendant's clearly retaliatory actions, as discussed above, and *infra.*

**F. Plaintiff's Claim For Retaliation.**

To establish a *prima facie* case of retaliation, a plaintiff-employee must establish that 1) Plaintiff engaged in a protected activity; 2) the employer took an adverse action against the plaintiff; and 3) a causal connection exists between the protected activity and the adverse action. *Nichols v. Harford County Board of Ed.*, 189 F.Supp. 2d 325 (D. Md. 2000).

In the instant matter, it is undisputed that in or about July of 1999, Plaintiff made allegations of sexual harassment against Mr. Herr to members of Lucent's Human Resources Department, in accordance with Lucent's stated sexual harassment policy. (See Lucent's Sexual Harassment Policy, attached hereto as Exhibit 34.) Between February and August of 2001, Plaintiff made further complaints regarding Mr. Moore, Ms. Worley, and Mr. Herr to Jennifer Mazzarello, as Ms. Hanlon's mentor; to Mr. Richard McFaul, as Plaintiff's former direct supervisor and as a C-Level Manager within Lucent; to Ms. Gerry Auer, as Lucent's Corporate Human Resources representative; to Ms. Laraine Scarpon, in her capacity as the Human Resource Manager on Lucent's Verizon Customer Team, to Linda Zachmann, to John Donaldson, to Don Ames and to Mr. Loprete, as Plaintiff's immediate supervisor following her transfer to the government team. These actions all constitute oppositional activity protected under Title VII. 42 U.S.C. §2000e-3; *Laughlin v. Metropolitan Washington Airports*, 149 F. 3d 253, 259 (4th Cir. 1998) ("Opposition activity encompasses utilizing informal grievance procedures as well as

PDFMAILER.COM   Print and send PDF files as Emails with any application, ad-sponsored and free of charge   www.pdfmailer.com

staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.") (citations omitted.)

As discussed above, Plaintiff has established facts that, if true, illustrate retaliatory motive on the part of Mr. Moore and, vicariously, Lucent, in reference to Plaintiff's claims of sexual harassment on the part of Mr. Herr.  Plaintiff has also alleged facts that, if true, establish retaliatory intent on the part of Mr. Moore independent of Plaintiff's allegations against Mr. Herr. After Mr. Moore learned of complaints regarding his conduct with Ms. Hanlon, Mr. Moore disparaged Plaintiff to other Lucent employees.  Mr. Moore threatened to remove Plaintiff from her compensation plan.  Ms. Worley forbade Plaintiff from meeting with customers, and excluded Plaintiff from her list of tem members.  Even after Plaintiff transferred away from Mr. Moore's supervision, Mr. Moore continued to disparage Plaintiff to other Lucent employees, and threatened to have Plaintiff transferred back under his supervision.

Finally, a causal connection exists between Mr. Moore's retaliatory intent against Plaintiff in creating an objectively hostile environment, in which Plaintiff was forced to seek a transfer, and ultimately resign from Lucent.  Mr. Moore's threat to remove Plaintiff from her compensation plan occurred within days of Ms. Mazzarello's confrontation with Mr. Moore regarding his relationship with Ms. Hanlon.[18]

## V.  Conclusion

WHEREFORE, for the foregoing reasons, because there is a dispute of material facts, and because Defendant is not entitled to summary judgment as a matter of law, Jennifer Mazzarello,

_____

18 Defendant further argues a lack of temporal proximity in relation to Plaintiff's allegations against Mr. Herr. (Defendant's Memorandum in Support, page 30.)  However, Mr. Moore had not been placed in a position to have supervisory control of Plaintiff and Ms. Mazzarello until August of 2000, upon his promotion to the D-Level Director's

Plaintiff, requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully Submitted,


_____/s/_____
Paul V. Bennett, Esq.
Law Office of Paul V. Bennett
133 Defense Highway, Suite 209
Annapolis, Maryland 21401
(410) 974-6000
Federal Bar No: 10324

Attorney for Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of September, 2003 that a copy of the foregoing Opposition to Defendant's Motion for Summary Judgment was sent by electronic filing to Robert R. Niccolini, Esquire, McGuire-Woods, LLP, 7 St. Paul Place, Suite 1000, Baltimore, Maryland 21202, Attorney for Defendant.  A copy of the Memorandum and Supporting Exhibits will be hand delivered to Mr. Niccolini within 24 hours of filing.


_____/s/_____
Paul V. Bennett, Esq.

## INDEX OF EXHIBITS

1.      Deposition of Lisa Bryan

2.      Deposition of Jennifer Mazzarello

3.      Deposition of Chris Herr

4.      Miscellaneous Performance Reviews and Evaluations

5.      Deposition of Richard McFaul

_____
position.

PDFMAILER.COM    Print and send PDF files as Emails with any application, ad-sponsored and free of charge    www.pdfmailer.com

6.        Deposition of Tom Moore

7.        Deposition of Dawn Dugan

8.        Deposition of Linda Zachmann

9.        5/27/99 E-mail from Chris Herr to Jennifer Mazzarello

10.      Affidavit of Lisa Bryan

11.      Outline of Issues

12.      Affidavit of Tammi Shapiro

13.      2000 Goals Form

14.      2000 Rankings and Ratings Form

15.      11/10/00 E-mail from Tom Moore to Lisa Bryan

16.      Deposition of Denise Panyick-Dale

17.      Deposition of Kelly Hanlon

18.      Affidavit of Jennifer Mazzarello

19.      Deposition of Laraine Scarpon

20.      Affidavit of Erica Adams

21.      Affidavit of Patricia Gilbert

22.      2/23/01 E-mail from Pam Worley

23.      3/12/01 Memo from Lisa Bryan to Gerry Auer

24.      Deposition of Pam Worley

25.      3/7/01 E-mail from Tom Moore to Lisa Bryan

26.      Deposition of Patrick Loprete

27.      4/30/01 E-mail from Patrick Loprete to Lisa Bryan

PDFMAILER. Print and send your PDFs with all the sponsored ... pdfmailer

28.    4/30/01 Pay Stub

29.    5/23/01 Statement of Events

30.    6/18/01 Letter from Lisa Bryan to Pamela Kimmet

31.    Deposition of Eric Hofstetter

32.    Deposition of Audrey Davis