IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LISA D. BRYAN,      :
   Plaintiff      :
           :
 v.         :   CIVIL NO. AMD 03-265
           :
LUCENT TECHNOLOGIES, INC., :
   Defendant     :
           :
       ...o0o...

MEMORANDUM OPINION

Plaintiff, Lisa D. Bryan ("Bryan"), instituted this employment discrimination action against her former employer, defendant Lucent Technologies, Incorporated ("Lucent"), alleging several claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. Specifically, Bryan alleges the following claims: (1) hostile work environment based on sex, which led to a tangible employment action, namely, her forced resignation; (2) disparate treatment gender discrimination, namely, reductions in compensation and in job responsibilities; and (3) retaliation for opposing unlawful practices. Discovery has concluded and now pending is Lucent's motion for summary judgment. The issues have been fully briefed and no hearing is necessary. For the reasons set forth below, I shall grant Lucent's motion for summary judgment.

I.

Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex Corp*., 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matushita Elec. Indust. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

II.

A.

In determining the appropriateness *vel non* of summary judgment in this case, as in every case, the facts and the reasonable inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmovant. That said, I am constrained to observe that this case is another in what seems to be a growing trend in which nonmovants' counsel perform a "sleight of hand" in setting forth alleged "facts" which are largely assertions wholly unsupported by admissible evidence, and in which, upon close inspection, the narrative "Statement of Facts" woven by counsel is exposed as a prolix admixture of (1) admissible first-hand testimonial evidence from depositions and affidavits and admissible documents; (2) plainly inadmissible second- and third-hand hearsay that is "dressed-up" as admissible evidence by being recounted in an affidavit or deposition of a witness with first-hand knowledge of *other or related* facts; and (3) rank speculation and inference-upon-inference recitations not even "dressed up" and lacking a citation to admissible record evidence.

This case is a paradigm of such brief-writing. For just one particularly egregious example, see page 21 of Bryan's Memorandum in Opposition to the Motion for Summary Judgment, where there appears the following:

> Towards the end of March [2001], Ms. Bryan spoke with Mr. Ames, at which time [Bryan] and Mr. Ames discussed that [Bryan] may be retaliated against for her reporting of [the harasser, Herr]. Mr. Ames responded that he did not know what was going on. (Bryan depo. page 428, lines 6-14).

> However, Mr. Ames did advise [Bryan] that he believed that [Bryan's supervisors] were trying to "get something" on [Bryan] in order to allege insubordination. Mr. Ames cited as an example an occasion when [one of Bryan's supervisors] called Mr. Ames to verify that [Bryan] had attended a meeting with him on March 16, 2001. (Bryan Affidavit). Mr. Ames further stated to [Bryan] a belief at that time that [Bryan's second level supervisor] and [Herr, the harasser] were friends. (Bryan depo., page 430 lines 4-7; [s]ee also Shapiro Affidavit).

It is immediately apparent to even the casual reader that this paragraph is absolutely overrun with inadmissible hearsay evidence as to what a critical witness, "Mr. Ames," said, thought, believed, and speculated about with Bryan. Moreover, it will be noticed that there are no citations to affidavit pages or paragraphs as to some assertions, even where such references are included.

With all respect to counsel, this is more akin to "fiction writing" than a legitimate "Statement of Facts" appropriate for inclusion in a legal memorandum opposing a well-documented motion for summary judgment. I want to go on record as expressing my strong condemnation of this seemingly growing practice. This district, unlike many others, does not require of counsel an annotated "Statement of Disputed Facts" with careful citations to the record supporting those contentions. *See, e.g.*, Local Rule 56.1 (D.Mass.)(providing, in part, "Opposition to motions for summary judgment shall include *a concise statement of the material facts of record* as to which it is contended that there exists a genuine issue to be tried, *with page references to affidavits, depositions and other documentation*")(emphases added); Local Rule 56.1(c) (S.D.N.Y.) (similar); Local Rule 56.1 (N.D.Ill.) (similar); Local Rule 12.1(a)(2)(D.R.I.) (similar). *See Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922

(7th Cir.1994) ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."). The absence of such a requirement in the local rules of this district reflects the court's continued faith in the judgment and probity of counsel who appear before this court. If this resort to "literary license" continues, however, *see Rowe v. Mass Transit Administration*, --- F.Supp.2d ---, ---, 2003 WL 23281546, *2 (D.Md. July 28, 2003), the judges of this district may find it necessary to join those districts that impose such requirements.[1]

Sloppiness, no less than dissimulation, is not a virtue in litigation. Counsel should not have to be reminded of what the Federal Rules of Civil Procedure already provide: that a sworn declaration is to be based on the personal knowledge of the declarant, is to set forth facts that would be admissible in evidence and is to show the competence of the declarant to testify to its contents. *See* Fed.R.Civ.P. 56(e). *See also Settle v. Baltimore County*, 34 F.Supp.2d 969, 977 (D.Md. 1999) ("While I understand and am sympathetic to the reality that, even under the best circumstances, direct proof of discriminatory intent is exceptionally difficult to obtain, this difficulty does not relieve plaintiffs of the burdens of production

---

[1]In *Rowe*, a similar instance to that pointed out here, I wrote:
> I am constrained to observe that plaintiff has taken broad liberties and claimed a robust literary license with the summary judgment record in numerous regards, e.g., by asserting as "facts" what are no more than argumentative contentions that rest on unreasonable and speculative presumptions as to the effect of historical occurrences, and by attempting to contort the summary judgment record to support wholly unreasonable inferences.

*Rowe v. Mass Transit Administration*, --- F.Supp.2d ---, --- , 2003 WL 23281546, *2 (D.Md. July 28, 2003).

imposed by Rule 56 and the well-established legal regime for analyzing employment discrimination claims for purposes of summary judgment."), *aff'd without op.*, 203 F.3d. 823 (4th Cir. 2000)(per curiam). The narrative recitation of "facts" in a legal memorandum must reflect these standards as well. While courts view the summary judgment record in the light most favorable to the nonmovant, courts "do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay." *Mays v. Rhodes,* 255 F.3d 644, 648 (8th Cir. 2001).

Accordingly, in adjudicating the pending motion, I shall rely only on facts that seem to me to be adequately supported by citations to the summary judgment record. This unexceptional proposition notwithstanding, however, it is an unwarranted and inexcusable imposition on the court to require the kind of searching scrutiny of the record for admissible evidence that is required to keep faith with the plaintiff's 29-page "Statement of Facts" in this case. In the final analysis, when such burdens are foisted on the court, a litigant's legal memorandum screams, "There is no case here." Counsel should take heed.

B.

1.

Bryan was hired in or about February 1978 by Lucent's predecessor, New York Telephone, as a telephone switchboard operator. From 1978 through 1998, Bryan occupied several positions at New York Telephone. Lucent, a corporation engaged in the design, manufacture, and sale of telecommunications equipment with an office in Linthicum,

Maryland, acquired New York Telephone. On or about October 1, 1998, Bryan was promoted to the position of contract manager on Lucent's Verizon Customer Service Team ("Verizon Team"), and transferred to the Linthicum office. Soon thereafter, Bryan was named an account manager on the Verizon Team's "Y2K Project." Around the same time, Christopher Herr ("Herr") was promoted to the position of Director of Sales Realization of the Verizon Team. Herr was the supervisor of several projects, including the Y2K Project, thus becoming the direct supervisor of Bryan, Jennifer Mazzarello ("Mazzarello"), Jim McIlvaine, and Larry Dorr.

Although Herr denies many of Bryan's allegations, it is accepted for purposes of the pending motion that, from October 1998 through August 1999,[2] Herr embarked on a pattern of inappropriate and harassing conduct toward Bryan and Mazzarello, his two female subordinates. Specifically, and among other things, perhaps, Herr was guilty of the following acts and omissions:

1. December 1998 - Herr told Bryan that he was exhausted from a trip with his wife in which his wife had him in bed all weekend.

2. January 1999 -

    a. Herr commented to Bryan that he had a former customer who would take trips to a nudist camp, and as a going away present gave Herr a blowup doll.

---

[2]Lucent identifies the period of alleged harassment as from December 1998 through July 1999. The specific dates of the alleged harassment are not important because Bryan concedes that Herr's harassing behavior ended well before 300 days prior to her filing a charge with the EEOC on December 14, 2001.

     b. Herr had lunch with the two male employees of the Verizon Team, McIlvaine and Dorr, but not with Bryan and Mazzarello, until the oversight was brought to his attention.

3. April 1999 -

     a. Herr told Bryan that he had awakened his wife when he dreamed of Bryan lying beside him and called out her name.

     b. Herr traveled to a New Jersey hotel with Bryan and another female co-worker and upon discovering that he had not reserved a room, asked of the two with whom he would be sharing a room.

4. May 1999 - Herr displayed his underwear to Bryan.

5. October 1998- July 1999 - Herr referred to Bryan as "big girl" and a female co-worker as "little girl."

6. November 1998 - July 1999 - Herr, responding to Bryan's reports, said on three to five occasions "tell me more, I'm getting a woody."

7. Herr stated on five or six occasions that a female supervisor made his "sphincter twitch."

8. Herr commented once that a phone conversation was so long he had to relieve himself in a bottle, and thereafter, when Bryan was on the phone, Herr would walk by and wave an empty bottle.

9. Herr referred to female supervisors as having their "panties in a ruffle."

Understandably, Bryan found this behavior unwelcome and harassing. In early July 1999, Bryan approached Herr and (apparently, not for the first time) complained about his behavior; perhaps, she also requested to be removed from the Verizon Team. Sarah Brazier ("Brazier"), Herr's supervisor, and Ed May ("May"), the Human Resources Director, contacted Bryan the following day, inquiring as to the reason for her transfer request.

-8-

Subsequently, Bryan met with Brazier and May to express concerns about Herr. Thereupon, May reprimanded Herr, and ordered him to undergo management training on issues of diversity and sexual harassment, although there is no record of Herr's attendance or completion of such training. Later in July 1999, Bryan was removed from Herr's supervision. Bryan assumed the position of Supplier Diversity Account Manager. Dick McFaul ("McFaul") supervised Bryan until the early summer of 2000, followed by John Donaldson ("Donaldson").

Bryan filed no charge of discrimination as a result of Herr's conduct and, indeed, the record seems to reflect that during the period from about mid-summer 1999 (when she transferred to the Supplier Diversity position) through early 2001, Bryan performed her responsibilities without difficulty and things were going well. Meanwhile, in June 2000, Tom Moore ("Moore") had been promoted to the position of Vice President of Sales Realization of the Verizon Team, with supervisory authority over Donaldson and Bryan. In November 2000, Pam Worley ("Worley") became Bryan's immediate supervisor, replacing Donaldson. Indisputably, there is ample evidence in the record that throughout her tenure on the Verizon Team, despite some difficulties in her personal interactions with some of her supervisors, Bryan was regarded as a valuable member of the team. *See, e.g.*, Pl.'s Exh. 4, Aug. 17, 2000, E-mail from Moore to Bryan ("Lisa, Nice job here. It's great to have you on the team.").

2.

A word is necessary here to explain Bryan's novel approach to the factual and legal issues in this case. While the summary judgment record is less than crystal clear, the gravamen of Bryan's theory of the case seems to be that, starting in about January 2001, her then supervisors, Moore and Worley, essentially conspired without justification to make her life at work difficult, and ultimately to oust her from Lucent altogether, motivated by their loyalty and/or friendship with Herr. On the whole, this theory is only marginally coherent; Herr seems to have suffered no significant adverse consequences from Bryan's complaints about his conduct, which had long-since ceased, thus undermining any inference of a desire for retribution on that account. Furthermore, Bryan has produced evidence that Moore did not want Worley selected as his subordinate on the Verizon Team. *See* Pl.'s Exh. 23, p.3, Report of Meeting with Moore on January 10, 2001. It would be strange, to say the least, for Moore then to enlist Worley as a co-conspirator. Nevertheless, with Herr's undeniably repugnant behavior as a backdrop, Bryan basically contends that every cross-word or unpleasant interaction with either Moore or Worley during the period from January through March 2001 is traceable to Bryan's mid-1999 report to management of Herr's harassing actions. This bold approach to the case is supported by little more than a scintilla of evidence.

In addition to Bryan's attribution of a discriminatory or retaliatory motive to Moore and/or Worley arising from their asserted affinity for Herr, Bryan seems to rely on two other

-10-

novel arguments in support of her claims. First, she contends that because Moore apparently was having an affair with one of his subordinates, an affair which Bryan disapproved of, she is entitled to ascribe a discriminatory and/or retaliatory animus to any and all of Moore's actions that she opposed, including Worley's closer supervision of Bryan at Moore's direction. Second, she seems to contend that she was entitled to act on the basis of her subjective assessment of alleged express and implied threats by Moore and Worley to take adverse employment action against her (even though no such alleged threats were ever carried out), and that therefore her otherwise voluntary decision to transfer to a less desirable position, and ultimately to resign her employment altogether, are chargeable to Lucent as adverse employment actions. I am constrained to conclude as a matter of law that Bryan's theory is, if not fanciful, then certainly insufficiently supported by admissible evidence to survive summary judgment.

3.

In Bryan's account, the first manifestation of the Moore/Worley conspiracy comes rather "out of the blue" when, on or about December 8, 2000, Bryan requested a "vacation carryover" form from Worley. In response, Worley allegedly screamed in the middle of the office that Bryan and Mazzarello "had a problem" working under her supervision, but that she (Worley) was "the boss."[3]  Bryan further contends that Worley: (1) failed to notify her about a presentation that Bryan was to make; (2) failed to return her e-mails or calls; and (3)

_____

[3]Similar "screaming incidents," as a result of which Bryan felt humiliated in the presence of co-workers, occurred in January and February 2001.

made her generally feel excluded from the team.

Worley, per Moore's instructions, re-evaluated Bryan's job performance. On February 10, 2001, Worley met with Bryan in order to discuss the Supplier Diversity Program, which Worley characterized as a "run-away train" under Bryan's leadership. (Of course, Bryan disputes Lucent's assessment of her work performance.) On February 13, 2001, Moore allegedly informed Bryan that her management of the Supplier Diversity Program was deficient, and that she would be removed from the Compensation Plan, thereby reducing her salary to its base level.[4]

Following the February 13, 2001, conversation with Moore, Bryan began contacting other managers at Lucent to seek a transfer to another team.  Bryan learned that there was a Marketing Manager position available on the Government Team under the supervision of Patrick Loprete ("Loprete"). Bryan would not receive a commission-enhanced salary in the new position, but she discussed with Loprete the possibility of moving into a sales position that offered commission enhancements in the future. In the meantime, Bryan requested a transition plan from Loprete to cover the loss of salary that she would experience with a move from her commissioned position to a non-commissioned one. Loprete worked with Moore to craft such a plan. Moreover, Bryan's transfer to the Government Team could not

---

[4]As I discuss *infra* in text, Bryan did not file a charge of discrimination until December 14, 2001. Thus, even assuming that the alleged February 13, 2001, threat by Moore to replace Bryan as manager of the Supplier Diversity Program constitutes an adverse employment action (which it is not), the threat is not actionable in this case because Bryan did not file her charge of discrimination within 300 days of the threat.

have been effected without Moore's approval, which was provided, and Bryan concedes that Moore expended considerable effort to ensure that Bryan received a fair transition plan.[5] Indeed, Moore agreed that one half of the costs of the transition plan would be charged to his budget. The transition compensation plan would have made up for most, if not all, of Bryan's lost commission income in transferring from the Verizon Team to the Government Team. Bryan accepted a position on the Government Team and transferred from Moore's supervision on April 1, 2001. Bryan apparently contends that her transfer was not a voluntary change of assignment that she willingly sought, but rather was a "constructive" adverse employment action.

Contemporaneously with Bryan's transfer, Lucent faced certain economic reversals, requiring it to downsize its workforce (including the Verizon Team) during February and March 2001. Bryan was not a target of either effort and was never told she would be laid off, although Bryan seems to contend that she acted reasonably in *suspecting* that she was being targeted for layoff. In the meantime, Bryan had been engaged in discussions with Signal Corporation ("Signal"), a minority-owned federal contractor, about a potential employment opportunity. Consistent with Bryan's apparent theory of her claims in this case, she asserts

---

[5]Paradoxically, Bryan contends, on the one hand, that Moore was seized with a retaliatory and/or discriminatory animus against her and intended to oust her from Lucent. Indeed, she further contends that even after she transferred, Moore threatened to arrange to return her to his team in order to cause her harm. For his part, on the other hand, Moore attests that he attempted to talk Bryan out of transferring because he viewed her as a valuable member of his team, and agreed to the transfer only reluctantly for that reason. Moore denies that he ever threatened to arrange for Bryan to return to his team. Evidently, it is Bryan's contention that Lucent should have allowed her to stay on the Verizon Team but remove Worley and Moore from the Verizon Team.

that she never wanted to leave Lucent and that she sought employment opportunities outside of Lucent only because she saw "handwriting" on the wall, i.e., Moore and Worley were out to damage her. On April 6, 2001, Signal offered Bryan the position of Vice President for Commercial Markets, which provided an opportunity to lead a new division. Bryan decided to accept the offer and tendered her resignation to Lucent; her last day on Lucent's Government Team was May 23, 2001. At the time of her resignation, Bryan was earning an annual salary in a range that regularly exceeded $100,000, plus bonuses; her position at Signal Corporation paid more than she earned at Lucent.

Bryan commenced her employment with Signal on June 1, 2001. Apparently, things did not go well at Signal, as Bryan did not generate the level of revenue that Signal expected. On November 28, 2001, Bryan wrote to Rob Smith, the Chief Administrator of Signal, in the course of a long letter of protest in response to criticism leveled at her, that she had "made not only a career decision but a life decision to leave Lucent Technologies after being employed for over 23 years. I would never have made a decision to leave for a short-term position." In any event, Bryan was terminated by Signal on November 30, 2001. (Bryan is engaged in litigation with Signal over her termination.) Bryan filed her charge of discrimination against Lucent with the EEOC on December 14, 2001, a mere two weeks later. (Meanwhile, Bryan had learned that within days after she resigned from Lucent in May 2001, Lucent had created an attractive "early-out" retirement program for which she would have been eligible but for her premature resignation. Evidently, one of the principal items

-14-

of relief Bryan seeks in this action is a temporary reinstatement of her employment at Lucent

under circumstances that would permit her to retire under the "early-out" program.)

III.

A.

As the Fourth Circuit has repeatedly observed:

> To establish a Title VII claim for sexual harassment in the workplace,
> a female plaintiff must prove that the offending conduct (1) was unwelcome,
> (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the
> conditions of her employment and create an abusive work environment, and
> (4) was imputable to her employer. *Spicer v. Va., Dep't of Corr.*, 66 F.3d 705,
> 710 (4th Cir.1995) (en banc).

*Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc), *cert.*

*denied*, 72 U.S.L.W. 3535 (U.S. February 23, 2004) (NO. 03-782). In this case, I need not

explore these elements because, manifestly, Bryan's sexual harassment claim is barred by

limitations.

Under Title VII, claims based on incidents that are alleged to constitute an adverse

employment action that occur more than 300 days prior to the filing of a charge with the

EEOC are time-barred. 42 U.S.C. § 2000e-5(e)(1); *National Railroad Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 109-13 (2002). To be sure, harassment claims typically are

"continuing violations" and often, therefore, permit a plaintiff to rely on otherwise time-

barred acts and omissions to support her claim. *Id*. at 115-18. Nonetheless, even under the

"continuing violation" doctrine, any incidents that occur prior to this time period are non-

cognizable unless plaintiff can show that they are  related to an incident within the period

-15-

as one or more in a series of separate but related acts amounting to a unitary violation. *Id*. at 120 ("A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."). In short, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice." *Id.* at 122.

Bryan alleges that Herr's inappropriate comments commenced in or about October 1998 and continued through July or August 1999 when she assumed responsibility for the Supplier Diversity Program under a successor supervisor. Bryan further alleges that the hostile work environment continued following her transfer to the Supplier Diversity Program because she was forced to "interact" with Herr because of the size of the office, the required attendance at meetings in which Herr was present, and the job performance evaluation conducted by Herr in December 1999. It is highly doubtful that these fleeting contacts by themselves are sufficient to prolong the cognizable period of Herr's indisputable harassing behavior. But even assuming that these contacts are sufficient to constitute a perpetuation of the hostile work environment created by Herr, it is *undisputed* that Bryan's last contact with Herr was in or about December 1999.  Bryan did not file her EEOC charge until December 14, 2001, two years after her last contact with Herr, and well beyond the requisite 300 day filing period.  Thus, Bryan's gender-based hostile environment claim is time-barred.

*Id.*[6]

Bryan attempts to avoid the limitations bar by seeking to connect the events of 2001 involving Moore and Worley to the harassing behavior of Herr, behavior which ended no later than December 1999. This effort is clearly unavailing. Bryan contends, for example, that her transfer from the Verizon Team to the Government Team on April 1, 2001, and her resignation on May 23, 2001 (each of which, she alleges, was a "constructive" adverse employment action), were part of a "series of separate but related acts amounting to a continuing violation." It is clear, however, that, even assuming such incidents are "constructive" adverse employment actions attributable to Lucent, they were not part of the same "unlawful employment practice" as the harassing behavior described above and engaged in by Herr. This is because (as discussed more fully *infra* in text and n. 9) the transfer and resignation were not "substantially related" to Herr's overtly sexual harassing conduct.[7] *See Luciano v. Coca-Cola Enterprises, Inc.*, --- F.Supp.2d.---, ---, 2004 WL

---

[6]Bryan's friend and co-worker, Jennifer Mazzarello, also filed a sexual harassment claim based on facts virtually identical to those relied on by Bryan. In *Mazzarello v. Lucent Technologies, Inc.*, Civil No. AMD 02-3576 (D. Md. July 24, 2003), I dismissed plaintiff's claims as time-barred. Recently, the Fourth Circuit affirmed the judgment. *See Mazzarello v. Lucent Technologies, Inc.*, No. 03-2083 (4th Cir. February 24, 2004)(per curiam)(unpublished order).

[7]Of course, I am fully cognizant that a successful gender harassment claim may be maintained even if the harassing conduct is bereft of explicit sexual innuendo. *See, e.g., Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331-32 (4th Cir. 2003) ("A trier of fact may reasonably find discrimination, for example, *when a woman is the individual target of open hostility because of her sex* . . . or when 'a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'") (en banc)(citations omitted)(emphasis added), *cert.*
(continued...)

438399, at *6 (D. Mass. March 10, 2004) (citing *Cuddyer v. Stop & Shop Supermarket Co.,*

434 Mass. 521, 533, 750 N.E.2d 928 (2001)); *accord Brissette v.Franklin County Sheriff's*

*Office*, 235 F.Supp.2d 63, 88-90 (D. Mass. 2003) (noting that the *Cuddyer* opinion "presaged

the Supreme Court's *Morgan* decision" and observing that where "at least one incident

occurs during the limitation period, which '*substantially relates*' to earlier incidents of abuse

and '*substantially contributes*' to the hostile environment," remote and more recent acts of

harassment may be tacked) (emphases added).[8] Thus, neither the transfer nor the resignation

(including the underlying circumstances that motivated Bryan to take such actions) weighs

---

[7](...continued)

*denied*, 72 U.S.L.W. 3535 (U.S. February 23, 2004) (NO. 03-782); *cf. Scannell v. Bel Air Police Dept.,* 968 F.Supp. 1059, 1065 (D.Md. 1997)("The critical inquiry 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'")(quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring). But even taking an expansive approach to the formal requisites of a claim for gender-based harassment, there is an utter absence of evidence that Moore or Worley were motivated in any manner by Bryan's gender, whereas, Herr's behavior was explicitly so based.

[8]Other post-*Morgan* efforts to elaborate on the character of the "relationship" that must exist between remote (i.e., time-barred) acts and more recent acts of harassment include the following: *McGinest v. GTE Service Corp.*, 2004 WL 439876, at *20 (9th Cir. December 2, 2002)("The Supreme Court has not yet given us specific guidance on the precise contours of a sufficient relation, so, for now, this is our job. Perhaps evidence of adequate relation might consist of the following: an identity of offenders, an identity of location, an identity of a sufficiently distinct mode of harassment, or a reasonable identity of time in relation to the applicable statute of limitations.") (O'Scannlain, J., concurring in part and dissenting in part) (footnote omitted); *Mems v. City of St. Paul, Dept. of Fire and Safety Services*, 327 F.3d 771, 785 (8th Cir. 2003) (seeming to apply a "separate and distinct unlawful employment practice" test), *cert. denied*, 124 S.Ct. 1052 (2004). In any event, I have uncovered the use of no test by any court that would remotely support Bryan's effort to connect the time-barred, overtly sexual harassing behavior engaged in by Herr through mid-1999 to the wholly non-sexual acts and omissions of Moore and Worley of February and March 2001. Beyond Bryan's conclusory assertions that the separate series of incidents should be tacked, she has not addressed the issue.

in the balance in Bryan's attempt to show a continuing violation that extended into 2001.[9]

_____

[9]Bryan has simply cobbled together a series of disparate incidents in her effort to support her contention that an actionable hostile work environment persisted into 2001, and indeed, that she suffered tangible employment losses as a result of the harassment, i.e., transfer and constructive discharge. For example, with respect to Worley, Bryan contends that Worley's re-evaluation of her job performance, prompted by Moore, and Worley's subsequent request of several other managers to check on Bryan's work, demonstrates a continuation of the "unlawful employment practice" perpetrated by Herr. Bryan further contends that her omission from Worley's e-mail identifying the members of Worley's team also contributed to the perpetuation of the hostile work environment. It could not be more plain, however, that Worley's activities bear no connection to the hostile work environment based upon sexual innuendo and outright propositions that Herr created. While it is surely frustrating to have one's work questioned after receiving positive evaluations and annoying to be omitted from an e-mail list, these actions are not probative of a *gender-based hostile work environment*. To the contrary, they are a far cry from the "unlawful employment practice" engaged in by Herr.

With respect to Moore, Bryan alleges that he threatened to remove her from the compensation plan, thereby resulting in a 75% decrease in pay. However, *Bryan was never removed from the compensation plan prior to her transfer to the Government Team*, which (as Bryan always knew) was a non-compensation plan position. Moreover, as Bryan concedes, Moore cooperated fully with Bryan's new supervisor, Loprete, to create an acceptable transition compensation plan.

Bryan also points to evidence that Moore referred to her as "a troublemaker" and "poison" when speaking to other Lucent employees, but there is no nexus shown in the available evidence between Herr's harassing behavior or Bryan's complaints of same, on the one hand, and Moore's opinion of Bryan's behavior and/or attitude in the workplace. Moore's behavior was perhaps juvenile and boorish, but that does not transmute that behavior into a continuing gender-based harassment violation."It is not enough . . . that the plaintiff *feel* intimidated or abused." *Carter v. Greenspan*, --- F.Supp.3d ---, ----, 2004 WL 326189, at *7 (D.D.C. February 19, 2004)(emphasis in original).

Bryan further contends that the intra-office relationship between Moore and a woman named Hanlon contributed to the hostile work environment that she experienced. Moore may have engaged in overly flirtatious, or even non-professional behavior with Hanlon that was inappropriate, but again, such behavior is not a part of "a series of related acts" rooted in Herr's behavior.

Ultimately, assuming the truth of Bryan's allegations, Worley's and Moore's actions may or may not be indicia of poor management and interpersonal skills, and it may even have been poor judgement on Moore's part to have an inappropriate relationship with a co-worker; however, those acts are not a part of a series of acts related to Herr's acts and comments which indisputably halted in or about December 1999. Moore became Bryan's second level supervisor in early 2000 and Worley in November 2000. Their unwelcome comments and increased scrutiny of Bryan's work performance occurred in or about early February 2001. Bryan's

(continued...)

*Id.* Accordingly, judgment shall be entered in favor of Lucent as to the sexual harassment claim.

B.

To avoid summary judgment as to her disparate treatment and retaliation claims, Bryan must project substantial evidence that Lucent's discriminatory or retaliatory intent (in whole or in part) brought about her transfer to the Government Team from the Verizon Team and/or that her ostensible voluntary resignation was in fact a constructive discharge in consequence of Lucent's intentional acts to oust her. Bryan may do so either through direct or circumstantial evidence of such animus (of which there is not even a scintilla), or she may rely on the well-recognized *McDonnell Douglas* "shifting burdens" approach (which is exactly what she seeks to do).

Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 807 (1973), the plaintiff must first demonstrate a prima facie case of discrimination or retaliation. "In general terms, a plaintiff establishes a prima facie case by proving a set of facts which would enable the fact-finder to conclude in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (citations omitted);

---

[9](...continued)
transfer and subsequent resignation in response to such scrutiny were not adverse employment actions at all, but even if they were, they certainly were not "substantially related" to her claims of a hostile work environment based upon sex. As a matter of law, the transfer and subsequent resignation were casually and temporally too remote, and logically disconnected, to Herr's behavior. *See also infra* pp. 28-29, 31-32.

*Von Gunten v. Maryland*, 243 F.3d 858, 863 n.1 (4th Cir. 2001) (noting that the same standard for an adverse employment action should be used for both retaliation claims and for disparate treatment discrimination claims).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory (or non-retaliatory) reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Because the employer's burden is one of production and not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992) (internal quotation marks omitted) (quoting *E.E.O.C. v. Western Electric Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir. 1983)). If the employer meets this burden, the presumption of discrimination (or retaliation) is eliminated, and the plaintiff bears the ultimate burden of generating a dispute of material facts as to whether the employer's nondiscriminatory (or non-retaliatory) reasons are pretextual, and whether the adverse employment action was actually taken because of the employee's protected status or in reprisal. *Hicks*, 509 U.S. at 511; *Munday v. Waste Mgmt. of N. America, Inc.*, 126 F.3d 239, 242 (4th Cir. 1997).

The Supreme Court clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). The Court reiterated that

-21-

evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147 (quoting *Hicks*, 509 U.S. at 519).  However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

1.

I shall first address the issues surrounding Bryan's transfer. Bryan contends that her transfer was an adverse employment action, i.e., a sort of "constructive demotion," and that Lucent may be held liable for this "constructive demotion" on either or both gender discrimination and retaliation theories. This claim fails for several independent reasons.

(a)

As to "discrete act" gender discrimination claims, the Fourth Circuit recently reiterated:

> To demonstrate the prima facie case of sex . . . discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 285 (4th Cir.2004) (en

banc). Bryan clearly is a member of a protected class and thus satisfies the first prong of the prima facie case. However, on the facts presented here, Bryan fails to satisfy any other element of the prima facie case.

Manifestly, as a matter of law, Bryan's transfer was not an adverse employment action. That is to say, as a matter of law on this record, Bryan's decision to leave the Verizon Team and the supervision of Worley and Moore was a wholly voluntary act of Bryan's choosing. *See supra* n. 9. Furthermore, to the extent that Bryan contends that it was Moore's alleged threat on February 13, 2001, which constitutes the animating "decision" prompting her to seek a new position within Lucent and ultimately to transfer from Moore's team effective April 1, 2001, Bryan failed to exhaust her administrative remedies in a timely fashion because she did not file her EEOC charge until December 14, 2001, more than 300 days after the alleged threat. Thus, Bryan fails to satisfy the second prong of the prima facie case.

Equally fundamental is the fact that Bryan was not performing her duties in a satisfactory manner. Worley and Moore asserted that Bryan's leadership of the Supplier Diversity Program was deficient (a "run-away train"). Bryan disputes this assertion, stating that she improved the operation of the program and increased the number of minority participants. *In fact, the record shows that Bryan increased the level of minority-vendor participation too high (far above Lucent's approved targets), thus harming Lucent's bottom line in a time of declining revenue*. In any event, it is not for this court to second-guess an employer's assessment of an employee's performance. Bryan's subjective opinion that she

was performing satisfactorily is insufficient to satisfy this element. *Cf. King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("[Plaintiff's] own testimony, of course, cannot establish a genuine issue as to whether [plaintiff] was meeting [the employer's] expectations."), *cert. denied*, 124 S.Ct. 922 (2003); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.) (noting that in adjudicating discrimination claims courts should not be drawn into the role of mediating differences of opinion as to job performance between supervisors and subordinates), *cert. denied*, 531 U.S. 875 (2000). Thus, Bryan fails to satisfy the third prong of the prima facie case.

Finally, even assuming that the summary judgment record could be stretched in the manner sought by Bryan such that she might be viewed as having satisfied the other elements of a prima facie case, Bryan cannot satisfy the fourth prong of the prima facie case of gender discrimination. Bryan was not treated differently than similarly situated individuals outside of her protected class. Bryan fails to identify any male employees who were treated differently or better than she was treated under similar circumstances.[10] Thus, Bryan fails to satisfy the fourth prong of the prima facie case.

Bryan also alleges that Moore's ostensible adverse actions against her (there were

---

[10]It is worth noting, as well, that the "fact that the decision makers were of the same protected class suggests no discriminatory motivation." *Demesme v. Montgomery County Government,* 63 F. Supp. 2d 678, 683 (D. Md. 1999). Worley, Bryan's immediate supervisor, is a member of the same protected class. Even assuming Worley's acts and omissions occurred within 300 days of Bryan's filing of her charge of discrimination (which they did not) however frustrating to Bryan they may have been, they do not carry probative value as proof of intentional gender discrimination.

none as a matter of law) supports her claim of disparate treatment sex discrimination in respect to the transfer because her transfer should be viewed as a reasonable response to Moore's antipathy toward her growing out of her complaints about Moore's romantic relationship with Hanlon. Specifically, as I understand this theory, Bryan contends that male colleagues who complained of Moore's relationship were not treated similarly. But Bryan does not identify any male colleagues who complained, let alone any who were treated less harshly than she as a consequence of their complaints. Furthermore, it goes without saying that an employee who complains of the existence of a consensual romantic or sexual relationship between co-workers has not been victimized by a "severe or pervasive" regime of harassing conduct such that there has been an alteration in the terms and conditions of employment. Thus, Lucent's motion for summary judgment on the gender discrimination claim in respect to the alleged "constructive demotion" shall be granted.

(b)

Similarly, in respect to her "constructive demotion" claim, Bryan is unable to establish a prima facie case of retaliation; thus, her retaliation claim (based on a purported "constructive demotion") fails as a matter of law. To establish a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179,

-25-

190 (4th Cir.2001).

The Fourth Circuit explained in *Von Gunten* that "[a]dverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment." *Id.* at 866 (quoting *Munday v. Waste Mgmt. of North America, Inc.,* 126 F.3d 239, 243 (4th Cir. 1997)). In *Von Gunten*, the Court determined that hyper-scrutinizing sick leave, requiring doctor's notes, following an employee around and questioning her activities, and downgrading a performance evaluation did not amount to adverse employment actions. *Id.* at 867-70; *see also Nye v. Roberts*, 159 F. Supp. 2d 207, 213 (D. Md. 2001) ("Reprimands do not automatically affect the terms and conditions of employment.") (citing *Nelson v. Univ. of Maine Sys.*, 923 F. Supp. 275, 281 (D. Me. 1996)), *vacated on other grounds*, 47 Fed.Appx. 247 (4th Cir. 2002).

Bryan asserts that Moore and/or Worley retaliated against her for engaging in protected activity. There is no dispute that, as to the complaints against Herr, Bryan plainly engaged in protected activity. However, as to any complaints about or objections to the actions of Moore and/or Worley, as a matter of law, for the reasons earlier discussed, Bryan was not engaging in "protected activity." Otherwise, every complaint an employee makes about her treatment on the job by a supervisor could be characterized as "protected activity," and this is not the law. Similarly, as discussed above, complaints about Moore's inappropriate (but consensual) relationship with Hanlon is not "protected activity." *Cf.*

*Mundy v. Palmetto Ford, Inc.,* 998 F.2d 1010, 1993 WL 280340, **2 (4th Cir. 1993) (unpublished)(holding that adverse action against employee motivated in part by his complaints of on-going affair between his supervisor and co-employee not protected by Title VII).

In any event, for the reasons stated above, Bryan's voluntary transfer to the Government Team was not an adverse employment action. Moreover, Bryan fails to establish a causal connection between the only protected activity in which she engaged (opposition to and/or complaints about Herr) and the alleged "adverse action." "To survive summary judgment . . . [Bryan] must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). "To satisfy the third element, the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity." *Id*.

As one court has observed:

> While causation depends largely on the particular facts and circumstances of a case, factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees.

*Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 165 (2000)(citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279-81 (3d Cir. 2000)). Bryan fails to satisfy the "causal connection" prong of a prima facie case of retaliation by any of the means recognized in

*Jaudon*.

(1)  *Temporal Proximity*

Bryan's transfer was effective on April 1, 2001. Bryan had been transferred from Herr's supervision in July 1999 to the position of the Supplier Diversity Program Manager. "[A] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Church v. Maryland,* 180 F. Supp.2d 708, 745 (D.Md.) (quoting *Dowe*, 145 F.3d at 657), *aff'd*, 53 Fed.Appx. 673, 2002 WL 31819679 (4th Cir. 2002). Manifestly, there is no temporal proximity between the alleged retaliatory conduct and Bryan's protected activity, her complaints against Herr.

(2)  *Intervening Pattern of Retaliatory Conduct*

The court in *Jaudon* noted that an "intervening pattern of retaliatory conduct" can also serve to satisfy the causal connection between the protected activity and the adverse action. *Id.* Bryan identifies the following incidents as evidence of retaliatory conduct.

> (1) Moore disparaged [Bryan] to other Lucent employees; (2) Moore threatened to remove [Bryan] from her compensation plan; (3) Worley forbade [Bryan] from meeting with customers, and excluded [Bryan] from [Worley's] list of [team] members; (4) Even after [Bryan] transferred away from Moore's supervision, Moore continued to disparage [Bryan] to other Lucent employees, and threatened to have [Bryan] transferred back under his supervision.

*Pl's. Opp. to Def.'s Mot. for Summ. J. at 46.*  While such actions may have proven upsetting to Bryan, as a matter of law, they are not evidence that a reasonable factfinder would consider a "pattern of retaliatory conduct" within the meaning of that term under Title VII.

*See Jaudon,* 125 F. Supp.2d at 165. Merely labeling conduct as retaliatory does not make it so. Worley forbade Bryan from meeting with customers and left Bryan's name off the team list. Neither individually nor collectively do these two actions rise to the level of a "pattern of retaliatory conduct." *Id.* Even taken in the context of past run-ins between Worley and Bryan, such as the office screaming incident over the vacation carryover form, these acts do not amount to retaliatory conduct. "Title VII's protections do not insulate one from either normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor." *Settle,* 34 F. Supp. 2d at 991.

Moore's alleged conduct, while juvenile, also fails to rise to the level of a "pattern of retaliatory conduct." *Jaudon,* 125 F. Supp. 2d at 165. Disparaging comments, while unpleasant, do not evince a pattern of retaliatory conduct. *Id.* Moore may have been an unpleasant person for whom to work, but that is not protected under Title. *Settle,* 34 F. Supp.2d at 991. Furthermore, Moore's threat to remove Bryan from her compensation plan and have her transferred back under his supervision never materialized. A superior's mere *threat* to take an employment action, like his unsuccessful *attempt* to take such an action, that is never realized, does not constitute an adverse employment action supporting a discrete act disparate treatment discrimination (or retaliation) claim. *Cf. Haynie v. St. Mary's County,* Civ. Action No. DKC 97-3062, 2001 WL 194297, *8 (D. Md. 2001). Thus, Moore's acts and omissions do not establish a pattern of retaliatory conduct sufficient to satisfy the

causation element of Bryan's ostensible retaliation claim.

(3) *Inconsistent Reasons by the Employer for the Adverse Action*

Lucent contends now, and has always contended, that Bryan's transfer was wholly voluntary. In this regard, it is to be recalled that Bryan was successfully supervised by McFaul and Donaldson without incident following her removal from Herr's supervision for more than a year. Bryan does not dispute that her time under their supervision was without incident. Bryan has submitted no evidentiary support of any "inconsistent reasons" offered by Lucent for the so-called adverse employment action, i.e., her "constructive demotion."

(4) *Differential Treatment of Other Employees*

Bryan is also unable to demonstrate that other employees received such differential treatment as to suggest that she was being singled out. In this regard, Bryan's assertion that Mazzarello, who also filed a claim against Lucent for hostile work environment based upon sex (*see supra* n. 6), was provided with a mentor after lodging her complaints about Herr, is of no moment. Bryan does not suggest that she was denied a "mentor." If anything, Lucent's assignment of a "mentor" to Mazzarello defeats, rather than supports, Bryan's claim of retaliation, as it undermines any suggestion or inference that reprisal against those who complained about Herr was a motivation for any act or omission by Lucent in 2001.

Thus, as to the alleged "constructive demotion," as a matter of law, Bryan's claim fails and Lucent is entitled to summary judgment.

2.

Finally, Bryan contends that her resignation (allegedly in response to either disparate treatment discrimination on the basis of gender or in response to actionable retaliation) constitutes a constructive discharge violative of Title VII. I disagree.

Constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Nye*, 159 F. Supp. 2d at 214 (quoting *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985)). A plaintiff must prove (1) deliberateness of the employer's action and (2) intolerability of working conditions. *Id.* (citing *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, 475 U.S. 1082 (1986)). "Although . . . [the Fourth Circuit] requires proof of the employer's specific intent to force an employee to leave, intent can be inferred from circumstantial evidence." *Id.* (citing *Bristow*, 770 F.2d at 1255); *see also Pollard v. High's of Balt., Inc.,* 281 F.3d 462, 472 (4th Cir.2002).

Bryan's submission falls far short of what is required to satisfy either prong. Bryan fails to present either direct or circumstantial evidence of Moore's and Worley's intent to force her to transfer or to resign. In satisfying the first prong of the constructive discharge claim, Bryan must demonstrate a "deliberateness of the employer's action." *Bristow,* 770 F.2d at 1255. Bryan offers the following as evidence of Lucent's deliberate action.

> (1) Moore stated that Bryan was previously evaluated based upon her appearance rather than her performance; (2) Moore ordered Worley to reevaluate Bryan's job performance; (3) Moore threatened to remove Bryan from her compensation plan; (4) Worley forbade Bryan from meeting with

customers; (5) Worley left Bryan's name off a list of [Worley's] team members; (6) Moore advised Bryan that he had absolved Herr and was planning to promote him; (7) Moore dismissed Herr's conduct as "boys will be boys;" (8) Moore disparaged Bryan in front of other Lucent employees; and (9) Moore asked Bryan, "How does it feel to have someone ruin your career without doing anything wrong?" [allegedly in reference to Herr]

*Pl's. Opp. to Def.'s Mem. for Summ. J. at 40.*    Moore's and Worley's statements and actions are not indicative of a "deliberateness of the employer's action." *Bristow,* 770 F.2d at 1255. The acts and statements that Bryan attributes to Moore and Worley are unsupported self-assertions, and in any event are not logically probative of the existence of an intent deliberatively to force Bryan to resign. Among other indicia of an absence of such an intent, as Lucent asserts, Worley and Moore could have, but did not, include Bryan among those scheduled for lay-off in consequence of the Lucent downsizing in February and March 2001. Thus, Bryan fails to satisfy the first prong of her ostensible constructive discharge claim.

Bryan also fails to satisfy the second prong of the test, "intolerability of working conditions." "Whether a plaintiff's working conditions were intolerable is assessed by the objective standard of whether a reasonable person in the plaintiff's position would have felt compelled to resign." *Taylor v. Virginia Union University*, 193 F.3d 219, 237 (4th Cir. 1999), *cert. denied*, 528 U.S. 1189 (2000). The Fourth Circuit has held that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (internal quotation marks omitted) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)). Bryan had transferred away from Herr's egregious and legally actionable behavior. Moore's

and Worley's comments, while making Bryan feel unfairly criticized, were not so insufferable and intolerable as to compel a reasonable person to resign a highly remunerative position. In short, applying the reasonable person standard, it is clear that the working conditions at Lucent were not so harsh as to support a constructive discharge claim. As the Fourth Circuit explained:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow*, 770 F.2d at 1255. Bryan clearly experienced "frustrations, challenges and disappointments" with her job and her supervisors, but the acts of Worley and Moore did not rise to the level of actionable wrongdoing. Thus, summary judgment shall be granted to the defendant on the claim of constructive discharge.

IV.

For the reasons set forth herein, Lucent's motion for summary judgment shall be granted as to each claim. An Order follows.

Filed: March 15, 2004                                   _____/s/_____

                                                        ANDRE M. DAVIS
                                                        UNITED STATES DISTRICT JUDGE